REVISED DECEMBER 13, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-10569
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JAMES MCFARLAND, JR

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

October 28, 2002

Before KING, Chief Judge, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS,
JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS,
BENAVIDES, STEWART, PARKER, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:

By reason of an equally divided en banc court, we affirm the
district court's judgment of conviction and sentence.

DAVIS and BENAVIDES, concurring in the affirmance of the judgment:

It is a deep mystery to us why five judges thought it helpful or appropriate to take eight fellow judges to task for failing to explain why they decline to change the established law of this circuit and create a circuit split.  We of course disclaim their attempt to attribute views to us.

GARWOOD, Circuit Judge, with whom JOLLY, HIGGINBOTHAM, JONES, SMITH, BARKSDALE, DEMOSS and CLEMENT, Circuit Judges, join, dissenting:

We respectfully dissent from the evenly divided Court's per curiam, unexplained affirmance of these convictions. The nature of the case and our reasons for concluding that reversal is required are set forth below.

———————————

James McFarland, Jr. appeals his conviction of four counts of robbery of local convenience stores in Fort Worth, Texas, in violation of 18 U.S.C. § 1951 (the Hobbs Act) and four corresponding counts of using and carrying a firearm during and in relation to those robberies in violation of 18 U.S.C. § 924(c)(1). He challenges his conviction on the Hobbs Act counts, asserting that the evidence was insufficient to establish the constitutionally or statutorily required nexus to interstate commerce and that the jury charge respecting this element was defective. A panel of this court affirmed per curiam. *United States v. McFarland*, 264 F.3d 557 (5th Cir. 2001). The panel considered itself bound by our prior decision in *United States v. Robinson*, 119 F.3d 205 (5th Cir. 1997), and *United States v.*

3

*Hickman*, 151 F.3d 446 (5th Cir. 1998), aff'd by an equally divided en banc court, 179 F.3d 230 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 2195 (2000). Judge Demoss specially concurred, 264 F.3d at 559-61, urging en banc reconsideration in light of the intervening decisions in *United States v. Morrison*, 120 S.Ct. 1740 (2000), and *Jones v. United States*, 120 S.Ct. 1904 (2000), the equally divided nature of the *Hickman* en banc affirmance and Judge Higginbotham's dissent therefrom. The Court subsequently took the case en banc. *United States v. McFarland*, 281 F.3d 506 (5th Cir. 2002).

*Facts and Procedural Background*

McFarland was charged in a ten count indictment with five Hobbs Act robbery counts, and five related section 924(c)(1) counts, pertaining to robberies of local convenience stores committed in Fort Worth, Texas, in November and December 1998.[1] He was acquitted of one of the robbery counts and of its related section 924(c)(1) count.[2] He was convicted on all the remaining counts. The four Hobbs Act counts of conviction (counts one, five, seven and nine) each alleged that McFarland "did knowingly and willfully obstruct, delay, and affect interstate commerce and did attempt to obstruct, delay and affect interstate commerce, by robbery, to wit: the defendant did take and obtain property, namely

---

[1]McFarland had been arrested for the robberies by Fort Worth police in late December 1998 and incarcerated in the Tarrant county, Texas, jail. He was later transferred into federal custody when the state dismissed its robbery charges against him and the United States Attorney adopted the robbery offenses for federal prosecution.

[2]The counts of acquittal were count three (robbery on November 24, 1998 of Haynie's Inc.) and count four (the related § 924(c)(1) count).

United States Currency, from the person and in the presence of . . . [name of store employee], an employee of . . . [name and address of store], against his will by means of actual and threatened force, violence, and fear of injury to his person."[3]

The stores involved, the amounts taken, in each case from the cash register, and the relevant dates of the four robberies were the following:

Count one, robbery November 20, 1998 of "Buy-Low" convenience store in which "about $100, close to $100" was taken;

Count five, robbery December 3, 1998 of Gateway Discount Liquor store in which "somewhere around 15 [$1,500] to $2,000" cash was taken;

Count seven, robbery December 11, 1998, Quickway Shopping

---

[3]Although, as indicated, these counts each reference "attempt," the jury charge makes no reference whatever to "attempt," and these counts were submitted to the jury entirely on a completed offense basis. There was no conspiracy allegation or count, each Hobbs Act count was submitted to the jury as a separate and distinct offense, and the jury was charged "A separate crime is charged in each count of the indictment. Each count and the evidence pertaining to it should be considered separately." The defendant acted alone in each of the robberies, although there is evidence indicating that in at least one of them he was driven from the site just after the robbery by his wife or girlfriend. There is no suggestion that the defendant (or the wife or girlfriend) was other than a resident of Fort Worth, or that he had any intention or purpose to do or accomplish anything other than simply what he did, namely take cash from each store robbed.

convenience store in which "about $50" cash was taken;[4]

Count nine, robbery December 21, 1998, Jeff Stop convenience store, in which $145 cash was taken.

Each of these four stores was a retail store, three being retail convenience stores and one a retail liquor store. There is no evidence that any of the four stores made any sales or shipments to points or purchasers outside of Texas, or, indeed made any sales other than at the store premises to retail purchasers resident in Fort Worth. There is no evidence that any of the stores was located at (or near) any transportation facility, such as a bus or train station or airport, or on an interstate highway. Three of the stores–Buy-Low, Jeff Stop and Gateway Discount Liquor–were apparently stand-alone, single location, concerns, unaffiliated, by common ownership or otherwise, with any other concern. The Quickway Shopping convenience store was apparently one of an unstated number of such stores so named, and William Gumfory, owner of the store robbed, may have owned some (or all) of the other

---

[4]"About $50" is the testimony of Rosa Candanosa, the employee on duty at the store when the robbery took place who took the money from the cash register and handed it to the defendant. The then store owner, William Gumfory, who at the time of trial in March 2000 had been retired for an unstated length of time, testified he was not at the store when the robbery occurred. When asked by the prosecution "can you tell us approximately how much your store was robbed the day Rosa Candanosa was working" he replied "I really don't recall, but I would say in the neighborhood of $100." No further precision was supplied nor is there any explanation of how or on what basis the "in the neighborhood of $100" was arrived at.

Quickway Shopping convenience stores.[5]  There is no evidence that any of the four robbed stores (or any Quickway Shopping store) had any facilities, property, employees, bank accounts or activities outside of Fort Worth, or was owned, in whole or in part, by any one not a Fort Worth resident.

Each of the four retail stores sold items of merchandise some of which the evidence showed were originally manufactured or processed outside of Texas.[6]  As to none of the three convenience stores was there any evidence indicating what fraction or percentage of their sales was of or allocable to items which had been manufactured or processed out of Texas, or what was the total dollar amount either of such sales or of all sales at the particular store.  As to the Gateway Discount Liquor store, one of the three Texas wholesalers who supplied it testified that ninety-five percent of what he distributed both generally and to that particular store "came from outside the state of Texas" and that a

_____

[5]The evidence in this respect is sparse, consisting only of the following.  William Gumfory replied "That is correct" to the prosecutor's question "Was one of the convenience stores that you owned Quickway Convenience Store shopping on 245 Bailey Fort Worth, Texas" [The store robbed on December 11, 1998].  And, a Weatherford, Texas, wholesaler testified that "we supplied Quickway Convenience Stores as a group," that he supplied the Quickway store at 245 Bailey Street, had long done business with Mr. Gumfory, and answered "yes" to the prosecutor's question did he "rely on Mr. Gumfory's stores, at least in the December '98 time frame, and stores like that, in conducting your business?"

[6]Such out-of-state items included the following.  The Buy-Low store sold cigarettes, Coors beer and Gatorade.  The Quickway Shopping store sold cigarettes, Tropicana Orange Juice, Coors beer, Gatorade, Nabisco snacks, Anacin and Purina dog food.  The Jeff Stop sold cigarettes, Tropicana Orange Juice, Coors beer, Anacin, and Purina dog food.  The Gateway Discount Liquor store sold various liquors produced outside of Texas.

very small amount of liquor or wine products was produced in Texas. The only evidence as to the Gateway Discount Liquor Store's dollar volume of sales and purchases was that it had $26,640.69 sales and $23,084.73 purchases from November 17 to November 30, 1998, and $34,910.03 sales and $36,547.67 purchases from December 1, 1998 through December 17, 1998, and that in the retail liquor business people start buying after Thanksgiving and the busiest time of year is from October through December.

There was no evidence that either the Buy-Low store or the Jeff Store acquired any of their inventory from sources outside of Texas, as opposed, for example, to acquiring it from a Texas wholesaler. Indeed, there was no evidence whatever as to how or from whom or where or on what basis either of those two stores acquired their inventory, except that they purchased it. The only evidence in this respect as to Gateway Discount Liquor is that it purchased its inventory from three Texas wholesalers, as required by Texas law. The only one of these three wholesalers who testified stated "I pay for that product beforehand, and its mine to distribute and sell and collect." Quickway Shopping purchased its merchandise inventory from a Weatherford, Texas, wholesaler, Hartnett Company, which in turn had purchased items including Tropicana juices from Florida, Wrigley's Gum and Gatorade from Chicago, and Purina dog food from Oklahoma. The goods Hartnett Company acquires come to a warehouse in Texas. It then sells them to local retail stores (and to some stores in Kansas). Quickway Shopping also sold money orders which it acquired from a company in Minnesota, and Mr. Gumfory testified "any money orders we sold we

8

paid off the same day" and estimated "we sold probably 300 a month."  It is not clear whether the 300 figure refers to the total number of individual money orders or the total face amount of the money orders sold per month.  Nor is it clear whether the reference is to all Gumfory's Quickway Shopping stores or the particular one robbed of $50 on December 11, 1998.

The owners when the robberies occurred of Buy-Low, Jeff Stop and Gateway Discount Liquor stores testified that the percentage of their gross sales proceeds used to restock inventory was seventy-five percent for Gateway and Jeff Stop and seventy percent for Gateway.  The former owner of Quickway Shopping testified that his profit margin on sales was approximately twenty-five percent, meaning that "if we sold $20,000 a month, we would have to buy $15,000 a month to replace it."  These store owners each gave brief, conclusory testimony that robbery of money from the store would cause problems  respecting, hurt or hinder inventory purchases.[7]  However, there was no evidence that any of the stores actually did purchase less, or delay any purchase, as a result of

---

[7]The Buy-Low owner answered "yes" when asked "when money is stolen from you like that, does it cause you problems in rebuying inventory."  The Jeff Stop owner answered "yes" when asked "when your store is robbed of its money, does that hurt your ability to re-buy, repurchase merchandise to sell in your store."  The Quickway Shopping owner, asked "if your store is robbed of its money, does that hinder your ability to replenish your stock," responded "well, naturally, we have less money to operate with."  The Gateway Discount Liquor owner, asked "if your store is robbed of money and you don't have that money, it hurts your ability to replenish your stock," replied "yes.  It does hurt us."  Comparable general testimony was likewise given by the liquor wholesaler, the wholesaler who supplied Quickway Shopping and a Coors distributor; these wholesalers also gave general testimony that if their customers didn't pay them they couldn't pay the suppliers from whom they had purchased their products.

(or following) the charged robbery of that store. No questions in that respect were asked of the Buy-Low or Jeff Stop owners, and no one identified as a seller or supplier to either testified.[8] Likewise, neither the Gateway Discount Liquor owner (whose sales and purchases rose following the robbery) nor the former Quickway Shopping owner, nor their wholesalers, ever testified that as a result of the charged robbery the retail store actually reduced or delayed any purchases, and their testimony suggests that they did not.[9] The Quickway Shopping former owner, when asked "were you not able to buy anything you would normally buy because that $100 wasn't there," responded "we would be able to buy it, but we would have to take the $100 from the bank or somewhere to keep our balances in the correct proportion."[10] The Gateway Discount Liquor owner, when asked "after the $1,500 to $2,000 was taken from you by the defendant, did it cause your business problems," responded

---

[8]The Buy-Low owner testified that at some unspecified time prior to the March 2000 trial he had elected to close his store, that "six or seven months" after the charged November 20, 1998 robbery, "we had another robbery," and that he closed his store for two reasons, "first of all" because his landlord sold the store premises and "number two" because "I'm tired of" being robbed.

[9]We also observe that the wholesaler supplying Quickway Shopping, when asked "how do you know a [customer] store has been robbed" responded "because they will call us and need an extra delivery because they don't have any product in their store." There is no evidence that this ever occurred respecting any of the four stores.

[10]The owner, when asked approximately how much was taken in the robbery, had stated "I really don't recall, but I would say in the neighborhood of $100." He was not present when the robbery occurred. The employee on duty testified that "about $50" was taken. There is no other evidence as to the amount taken (see note 4, supra).

10

> "It kept me a little stretched. In business every day sales are ringing, but we have to overstretch some bills and tell the distributor that we won't be able to pay you today, but we'll pay you in the next two or three days."

Apart from the just above quoted testimony of the Gateway Discount Liquor owner, there was no evidence that any of the robberies resulted in any of the victim stores even slightly delaying any payment to any party as a result of the charged robberies.

McFarland made and renewed timely motions for judgment of acquittal on the grounds, *inter alia*, that the required nexus to interstate commerce was not shown as to any of the Hobbs Act counts. These motions were overruled. The trial court's jury charge instructed, with reference to the Hobbs Act counts, that, among other things:

> "If you decide that there is any effect at all of [sic] interstate commerce, then that is enough to satisfy this element. The effect can be minimal. A showing that a business regularly buys goods from out of state allows an inference that a robbery may impair a future purchase . . . . If you find beyond a reasonable doubt that the defendant's conduct affected interstate commerce, then you may conclude that the government has met its burden of proof as to the interstate commerce element of the offense."

McFarland objected to the word "any" in the first sentence above quoted, objected to the sentence "the effect can be minimal," and to the failure to include the word "substantially," as he had previously requested, between "conduct" and "interstate commerce" in the last above quoted sentence. These objections were all overruled.

## *Discussion*

As noted, the principal issue presented is whether the Hobbs Act extends, or may be applied consistent with the limitations of

11

the Commerce Clause reflected by *Lopez* and *Morrison*, to these robberies of local retail stores.

I.  The Act, its history and Supreme Court interpretation

The Hobbs Act, 18 U.S.C. § 1951, provides in relevant part:

"  (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

  (b) As used in this section–

. . .

  (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."[11]

---

[11]The balance of the statute consists of paragraphs (1) and (2) of subsection (b), reading as follows:

"  (1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

  (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

and subsection (c), which provides:  "  (c) This section shall not be construed to repeal, modify or affect section 17 of Title 15,

12

It was originally enacted July 3, 1946, ch. 537, Pub. L. 486, 60 Stat. 420,[12] as an amendment to the generally similar Anti-Racketeering Act of June 18, 1934 (the 1934 Act), Pub. L. 376, 48 Stat. 979-80.[13]  The Hobbs Act was occasioned by the holding in *United States v. Local 807*, 62 S.Ct. 642 (1942) that the 1934 Act, by virtue of its exclusion relating to an employer's payment of wages to an employee and its provision indicating an intent not to diminish union rights, did not apply to the activities of members of a New York City truck drivers union who, by violence or threats, extracted payments for themselves from out-of-state truckers in return for the unwanted and superfluous service of driving the trucks to and from the city.  *Id*., at 643-44, 649; *United States v. Enmons*, 99 S.Ct. 1007, 1011 (1973) ("[A]s frequently emphasized on the floor of the House, the limited effect of the bill was to shut off the possibility opened by the *Local 807* case, that union members could use their protected status to exact payments from

---

sections 52, 101-115, 151-166 of Title 29 or sections 151-188 of Title 45."

[12]In the 1948 revision and codification of Title 18, purely formal, stylistic changes were made to the Hobbs Act (largely reordering and consolidating its subsections and paragraphs). June 25, 1948, Pub. L. 772, c. 645, 62 Stat. 793-794.  In 1994 the words immediately following "fined" in subsection (a) were changed from "not more than $10,000" to "under this title." Sept. 13, 1994, Pub. L. 103-322, Title XXXIII, § 330016(1)(L), 108 Stat. 2147.

[13]The 1934 Act was subsequently codified, without substantive change, as §§ 420a through 420e of Title 18, U.S. Code 1940 Ed.

employers for imposed, unwanted and superfluous services.").[14]

The Senate Report on S. 2248, which (as amended) became the 1934 Act, states that "the nearest approach to prosecution of racketeers as such has been under the Sherman Antitrust Act" but such prosecutions have been hampered by the requirement of proving conspiracy or monopoly and by being merely a misdemeanor, and that the proposed bill "is designed to avoid many of the embarrassing limitations . . . of the Sherman Act, and to extend Federal jurisdiction over all restraints of any commerce within the scope

---

[14]*See also United States v. Green*, 76 S.Ct. 522, 525, 526 (1956) ("The legislative history makes clear that the new [Hobbs] Act was meant to eliminate any grounds for future judicial conclusions that Congress did not intend to cover the employer-employee relationship;" "The city truckers in the *Local 807* case similarly were trying by force to get jobs from the out-of-state truckers by threats and violence"); H.R. Rep. 238, 79th Cong., 1st Sess. (1945) (reporting favorably H.R. 32 which became the Hobbs Act, the report consisting mostly of verbatim quotation of the entire *Local 807* majority opinion and dissent); 89 Cong. Rec. 3202 (1943) (". . . it is the intention of the Committee on the Judiciary to enact legislation for one purpose, and one purpose alone, namely, to correct the unfortunate decision in the Local 807 case") (Rep. Walter); 91 Cong. Rec. 11841-11842 (1945) ("I want it distinctly understood that the legislation under consideration is designed to meet one situation and one situation alone. . . . Let us see what that situation is. Unfortunately, the Supreme Court in the famous Local 807 case by a very strained construction . . .") (Rep. Walter); 91 Cong. Rec. 11841 (1945) ("The sole purpose of the bill . . . is to undo the outrageous opinion of the Supreme Court in the Teamsters Union case where that Court legitimatized highway robbery committed by a labor goon") (Rep. Cox); 91 Cong. Rec. 11900 (1945) ("This bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce. That is all it does. . . . this bill is made necessary by the amazing decision of the Supreme Court in the case of the United States against Teamsters Union 807 . . . That is all this bill does. We think a mistake was made by the Supreme Court. We are attempting to correct it . . .") (Rep. Hancock).

The Congressional Record does not reflect any Senate debate or discussion of the Hobbs Act.

14

of the Federal Government's constitutional powers." S. Rep. 532, 73rd Cong., 2nd Sess. (1934). The House Report on S. 2248, which recommends a rewritten form of S. 2248, states "this is the so-called 'antiracketeering bill' for the suppression of racketeering in interstate commerce," and quotes a memorandum from Attorney General Cummings noting that the bill, with the suggested amendments, had been approved by representatives of organized labor and that "The Sherman Antitrust Act is too restricted in its terms and the penalties thereunder are too moderate to make that act an effective weapon in prosecuting racketeers. The antiracketeering bill would extend the Federal jurisdiction in those cases where racketeering acts are related to interstate commerce and are therefore of concern to the Nation as a whole." H. Rep. 1833, 73rd Cong., 2nd Sess. (1934). Despite the breadth of some of this language, it may be seriously doubted that Congress then contemplated that it was making a federal crime the "plain vanilla" cash robbery from a local retail store of the sort here involved. Moreover, at that time the federal government's commerce power was generally viewed far less expansively than it later came to be. *See Lopez*, 115 S.Ct. at 1628. The then view of the commerce power is also suggested by S. Rep. 1189, 75th Cong., 1st Sess. (1937), the report of the principal congressional committee (the Copeland Committee) working on the 1934 Act (*see United States v. Culbert*, 98 S.Ct. 1112, 1115 & n.6 (1978)), recounting its investigations, commencing in 1933, into racketeering and the recommendations it had made for legislation (including the 1934 Act). This report reflects an understanding that there were meaningful limits on the

15

commerce power.  For example, the report mentions the "Poultry Racket" "practiced upon the live-poultry business in New York City," to which the "poultry comes from the Southern and Midwestern states," and, due to the rackets, the charge for shipping a carload of poultry from Chicago to New York was less than the charge for its unloading and delivery in New York City.  *Id.* at 16, 17.  The report notes "[w]hile some phases of the poultry racket were of a local nature and *not within Federal jurisdiction*, the committee felt that insofar as the transportation and distribution of live poultry was interstate in character, the necessary legislation should be enacted. . . ."  *Id.* at 18 (emphasis added).  The report also discusses "the 'kick-back' racket . . . that nefarious practice of requiring the employee to give back to his employer a percentage of his earnings," *id.*, observes, respecting the "kick-back racket," that "a great proportion of the complaints came from the building trades" but "[i]t is, of course, practiced in other industries," *id.* at 19, and concludes, respecting the kick-back racket, that: "After a thorough study of the testimony given and the complaints made, the committee concluded that the majority of the cases presented were of a local nature and were *not within the jurisdiction of the Federal Government*.  But it was decided that the committee could effectuate the purpose of certain Federal statutes concerning rates of wages to be paid on work done under [Federal] Government contracts."  *Id.* at 20 (emphasis added).[15]

---

[15]We are aware of the language in Judge Learned Hand's opinion in *United States v. Local 807*, 118 F.2d 684 (2d Cir. 1941), *aff'd*, *United States v. Local 807*, 62 S.Ct. 642 (1942), where, in the course of reversing the convictions of the union

truckers for violating the 1934 Act, he remarked "[f]or a number of years before 1934–at least in the City of New York–the levy of blackmail upon industry, especially upon relatively small shops, had become very serious, and the local authorities either would not, or could not, check it. . . . It was, at least primarily, to check such Camorras that Congress passed this measure [the 1934 Act]." 118 F.2d at 687-88. In *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975), the en banc Seventh Circuit, in upholding (over three dissents) a Hobbs Act conviction for extorting $3,000 from a property owner to procure a zoning change authorizing construction of an animal hospital (which would have involved importing equipment from other states) despite the fact that the owner, for unrelated reasons, later elected not to build the hospital and improved the property with other construction which would have been permitted without the zoning change, relied on this language of Judge Hand's to broadly construe the Hobbs Act's commerce coverage, *Straszcuk* at 57, in support of its ultimate conclusion to affirm even though "the record demonstrates the extortion had no actual effect on commerce." *Id*. at 60. We attach no significance to Judge Hand's quoted language. In the first place, Judge Hand in the passage in question was not addressing the matter of an interstate commerce nexus–which was plain and undisputed in the case before him–but was rather distinguishing labor related extortion from other kinds. Further, it is entirely unclear what he meant–especially as it might bear on interstate commerce–by "industry" and "relatively small shops." And, Judge Hand cites absolutely nothing–no legislative history, no publications, nor anything else–in support of his quoted observations (nor is any such support cited in *Staszcuk*). Finally, the quoted passage in Judge Hand's opinion was not cited or alluded to, or anything similar to it stated, by the Supreme Court in the *Local 807* case (or in any other case of which we are aware). Doubtless in 1933 and 1934 there was great concern about rackets and crime, but that does not suggest that Congress had a broad view of its Commerce Clause powers or intended to legislate in matters "of a local nature." In addition to the passages of the Copeland Committee report cited in the text above, we also note the following:

> "Demands in great numbers for all types of investigations, into all kinds of wrongs, reached the committee. These varied from requests that the committee investigate the internal affairs of municipalities, to requests that it look into specific financial transactions, alleged unconscionable mortgage foreclosures, and the like. The public generally seemed to be unaware of, or at least not alive to, the jurisdictional boundaries in this field created by the constitutional limitations on the power of Congress.
> . . . .
> [I]t was clear that the committee was not intended as a superpolice, nor as a prosecuting or judicial body for

17

By the time the Hobbs Act eventually passed, the Supreme Court had already begun its articulation of a Commerce Clause power greatly expanded over that as previously defined.  *See Lopez*, 115 S.Ct. at 1628.  However, this does not seem to have been a matter at all the subject of consideration by Congress in enacting the Hobbs Act, and the Act was merely directed at changing the result in the *Local 807* case.  *See* note 14 and accompanying text, *supra*. The wording of the Hobbs Act did not in any presently meaningful way change the 1934 Act's interstate commerce nexus requirement.[16]

---

> the supervision and investigation of the activities of local authorities.  On the contrary, the subcommittee was organized to consider ways and means by which the Federal Government might aid in the suppression of rackets and racketeering, and, therefore, its activity would have to be limited for the most part to matters falling within the categories of interstate commerce and use of the mails."

*Id*. at 2.

[16]The 1934 Act defined "trade or commerce" as "trade or commerce between any States, with foreign nations, in the District of Columbia, in any Territory of the United States, between any such Territory or the District of Columbia and any state or other Territory, and all other commerce over which the United States has constitutional jurisdiction."  The Hobbs Act definition is of the term "commerce" instead of the 1934 Act's "trade or commerce," defined "Territory" as meaning "any Territory or possession of the United States," omitted the word "constitutional" just before "jurisdiction," and added the category "between points within the same State, Territory, or the District of Columbia but through any place outside thereof."  The Hobbs Act definition is otherwise the same as in the 1934 Act. The Hobbs Act's addition of the latter category, if meaningful at all, would merely appear to suggest concern that without it something might possibly have been inadvertently excluded.  The concluding "all other commerce" clause in the Hobbs Act (and in the 1934 Act) would appear to include commerce between points in a single State and an Indian Tribe within that state, *see, e.g.*, *Morton v. Moncari*, 94 S.Ct. 2474, 2483 (1974); *Perrin v. United States*, 34 S.Ct. 388, 389 (1914), and commerce between points in the same state by a vessel traveling along the portion of a

Nor is any more expansive relation to interstate commerce suggested by the Congressional committee reports on H.R. 32, the bill which became the Hobbs Act. The House Committee on the Judiciary report states that the bill is a "successor" to similar bills introduced in the 77th and 78th Congresses (the first not acted on, the second passing the House but not acted on by the Senate), and that the bill's purpose is "to prevent interference with interstate commerce by robbery or extortion." H. Rep. 288, 79th Cong., 1st Sess. (1945), at 1. It goes on to say that the bill

> "is an amendment of the existing antiracketeering law which was enacted in 1934. It was passed in an effort to eliminate racketeering in relation to interstate commerce, of concern to the Nation as a whole. That statute came under examination of the Supreme Court in *United States v. Local 807*, and the opinion in that case is set out in full, both the majority opinion and the dissent:", *id*. at 1, 2,

which opinions the report then proceeds to quote in full. *Id*. at 2-9. Thereafter, the report recites that the bill's objective "is to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion." *Id*. at 9. The concluding section of the

navigable waterway wholly within that state. *See, e.g.*, *Ex Parte Garnett*, 11 S.Ct. 840, 842 (1891).

The required nexus to commerce in the proscriptive section of the 1934 Act ("Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce") appears as broad as that of the comparable provision in Hobbs Act ("whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce"), the latter essentially treating "movement" as the equivalent of "moving or about to move," and substituting "commerce" for "trade or commerce."

report commences by stating "The Congress does not need to be reminded that the Constitution of the United States confers on it the *exclusive* and unlimites [sic] power to regulate interstate commerce," *id*. at 10 (emphasis added), that "the members of the Constitutional Convention agreed that our Federal Government would be destroyed if barriers should be erected in any way to impede the free flow of interstate commerce," and, finally, that "This bill would outlaw two kinds of criminal interference with interstate commerce." *Id*. Certainly what this report is concerned with is interference with the movement of articles in interstate commerce, with interstate commerce itself.[17]

The debates in the House are wholly consistent with this.[18] As previously observed, these debates reflect that the "sole" purpose and effect of the Hobbs Act was to override the *Local 807* case and remove the exemption from the 1934 Act which that case was thought to create for union members. *See* note 14, *supra*, and accompanying text. Two other aspects of these debates should be mentioned.

First, the discussion of the evils the pending bill was

_____

[17]The brief, half page Senate report does not point in any different direction. Its only relevant statement is the following:

> "The purpose of this bill is to prevent interference with interstate commerce by robbery or extortion, as defined in the bill. . . . this bill is an amendment of the existing law which was enacted in 1934. The objective of the amendments is to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion."

[18]The Congressional Record does not reflect any debate or discussion in the Senate.

designed to eliminate focused almost entirely on the interruption of commodity shipments actually moving in interstate commerce, principally agricultural commodities being carried by truck across state lines.[19]

---

[19]*See, e.g.,* 89 Cong. Rec. 3203 (1943) (Rep. Walter) ("Farmer after farmer in the eastern part of Pennsylvania has been stopped at the entrance to the Holland Tunnel [into New York], compelled to get off his truck and give to some man $9.40 to deliver that truck to a point where that farmer had been delivering his produce for a great many years"); 91 Cong. Rec. 11902 (1945) (Rep. Walter) ("a processor from . . . Bethlehem [Pa] . . . informed me he was no longer shipping articles to New York by truck but was shipping them by train because he was compelled to kick in . . . $10 for every load of his materials that went into the gentleman's city"); *id.* at 11903 ("the practice of members of that union to post themselves at the bridges and at the Holland Tunnel.  Here would come a farmer, say, from North Carolina with a load of vegetables.  The union members would stop him at the bridge . . .") (Rep. Gwynne); *id.* at 11904 ("some of us out in the country know something more about New York . . . some of my [Pa.] neighbors are paying as much as $90 a load to take their produce in and get out alive in their trucks") (Rep. Gross); *id.* at 11905 ("The products of the farms were being trucked from New Jersey, Pennsylvania, and Maryland, and hundreds of these trucks were help up when they approached the city limits of New York and especially the Holland Tunnel") (Rep. Robsion); *id.* at 11906 ("These crimes are not confined to racketeers in the labor movement.  We have many instances where one group of farmers has taken possession unlawfully of the trucks of other farmers and overturned the trucks and destroyed the produce of the others by violence and fear and prevented the trucks moving in interstate commerce") (Rep. Robsion); *id.* at 11910 (article from Dawson, Minnesota, paper reciting that Dawson farmer sent to De Moines, Iowa, to pick up machinery to install driers at Dawson elevators was forced by Iowa labor groups to return to Dawson without his load and to join union and pay dues "before they would permit him to leave with his truck") (Rep. Anderson); *id.* at 11911 ("Let us illustrate what we are proposing to stop by this measure we are now considering.  Here comes a farmer with a load of produce—milk, butter, eggs, vegetables, . . . As they near a State line in going to market to sell that produce a thug they never saw before or a coterie of thugs comes up to the truck and says, 'Here, stop your truck.'") (Rep. Jennings); *id.* at 11917 ("I want the farmers of this Nation protected from hijacking, robbery, and assault when they deliver milk from New Jersey to New York, or produce from South Carolina to New York") (Rep. Rivers).

Other aspects of the debate likewise reflect an emphasis that the bill applied only to interstate commerce, without any broad reading of that concept. *See, e.g.,* 89 Cong. Rec. 3210 (1943) ("It is directed against robbery and extortion when used to obstruct the free flow of goods in interstate commerce, no matter who the offenders may be.") (Rep. Hancock); 91 Cong. Rec. 11843 (1943) (". . . it is the duty of Congress to protect its citizens and the people who use the highways in interstate commerce. Remember, *this proposal applies to interstate commerce only*. . . . if interstate commerce is being interfered with, and if the farmers and truckers, who take food into New York from the surrounding territory and States, must submit to the treatment outlined by Chief Justice Stone, then it seems clear that it is the obligation of the Congress to furnish national protection in these *interstate operations*." (emphasis added) (Rep. Michener); *id*. (Rep. Graham. "Is not this bill limited to interstate commerce *alone*?" Rep. Michener. "Certainly."; emphasis added); *id*. (Rep. Robsion. "Would this apply to those conditions in a number of other States where they meet and overturn milk trucks and do other things like that?" Rep. Michener. "This bill applies to interstate commerce *only*."; emphasis added); *id*. at 11912 (". . . the sole and simple purpose, the single purpose, of this bill is to do the best we can to protect interstate commerce and free the highways and streets of this country of robbers") (Rep. Hobbs). The following exchange is similarly relevant:

> "Mr. GRANGER. This applies only to interstate commerce, does it not?
> Mr. SPRINGER. It applies to interstate commerce.

22

Mr. GRANGER. It would not affect a farmer who picked up produce within his own State and delivered it within his own State? That would be intrastate commerce?
Mr. SPRINGER. Yes.
Mr. GRANGER. What is interstate commerce? Is a farmer who crosses the State line with his own property engaged in interstate commerce?
Mr. SPRINGER. There is no doubt but that he is engaged in interstate commerce when he crosses a State line.
Mr. ROBSION of Kentucky. A transaction within a State may be interstate commerce if it oppresses and interrupts seriously or in a substantial way goods moving from one State to another?
Mr. SPRINGER. The gentleman is entirely correct. That has been defined by judicial decisions." *Id*. at 11910.

We are aware of nothing in the legislative history relating or referring to the aggregation principle or anything comparable to it as applicable to discrete intrastate actions which individually have only a minimal, indirect and attenuated effect on interstate commerce.

This legislative history strongly suggests to us that Congress in enacting the Hobbs Act was concerned with protecting against relatively direct obstruction of the actual movement of goods in interstate commerce, and did not contemplate its application to robberies of local retail stores such as those here.[20] However, the

---

[20]Moreover, so far as we are aware the 1934 Act was never applied to robberies of local retail stores such as those here, and for many years the Hobbs Act apparently was not either. *Cf. United States v. Enmons*, 93 S.Ct. 1007, 10015 (1973) ("It is unlikely that if Congress had indeed wrought such a major expansion of federal criminal jurisdiction in enacting the Hobbs Act, its action would have so long passed unobserved;"also invoking principles of strict construction of criminal statutes and reluctance to assume significant change in relation between federal and state criminal jurisdiction in declining broad construction of Hobbs Act). Further, the "depletion of assets" theory, which is essentially the basis for Hobbs Act prosecutions such as that in this case, seems to have had its origin in *United States v. Provenzano*, 334 F.2d 678 (3d Cir. 1964), where, in upholding a "depletion of assets" jury charge in a conviction for extorting $30,000 from an interstate trucking company to prevent

23

Supreme Court in *Stirone v. United States*, 80 S.Ct. 270 (1960), stated that the Hobbs "Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.' 18 U.S.C. § 1951(a) . . ." *Id*. at 272. The victim there was extorted of some $31,000 to avoid cancellation of his contract to supply from his Pennsylvania plant concrete for the construction of a Pennsylvania steel mill; the victim depended on shipments of sand to him from outside of Pennsylvania to make the concrete, and such shipments would have slackened or stopped had his contract to supply the steel mill job been cancelled. *Id*. The Court observed that "[i]t was to free commerce from such destructive burdens that the Hobbs Act was passed," citing *United States v. Green*, 76 S.Ct. 522 (1956). *Stirone*, at 272.[21] *Stirone*

---

labor disruption of its terminal, the court stated:
> "We can perceive no reason why extortive payments, *in substantial amounts*, paid as here from the treasury of a company *engaged in interstate* commerce in order *to avoid obstruction of the company's interstate business* should not be deemed to affect commerce and therefore to lie within the proscription of the Hobbs Act. . . . This was the substance of the court's charge. We hold it to have been a correct one in the light of *all the circumstances*." *Id.* at 693 (emphasis added).

In *Esperti v. United States*, 406 F.2d 148 (5th Cir. 1969), we relied on *Provenzano's* depletion of assets theory in sustaining a Hobbs Act conviction for robbery of $2,000 (proceeds of a sale to a Chicago customer) and attempted extortion (to collect a $25,000 alleged debt to a New Yorker), the Florida victim being "Red Ball Merchandising" which "sold close-out merchandise" and whose "interstate sales and purchases amounted to ninety per cent of its business."

[21]In *Green* the Court held the Hobbs Act applied to a union agent's threats of violence to force an employer to pay union members for unwanted and superfluous services notwithstanding

24

went on to state that it did not have to decide the "more difficult question" of whether an adequate interstate commerce nexus would have been shown by the evidence that the steel mill would produce steel to be shipped in interstate commerce. *Id*. at 272. Later, in *United States v. Culbert*, 98 S.Ct. 1112 (1978), the court stated that the "in any way or degree . . . affected commerce . . . by robbery or extortion" words of the Hobbs Act "do not lend themselves to restrictive interpretation," and proceeded to quote *Stirone's* statement that they manifest "'a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'" *Culbert* at 1113.[22]

---

that payments to the union or the agent personally were not sought, noting that "The city truckers in the Local 807 case similarly were trying by force to get jobs and pay from the out-of-state truckers by threats and violence. The Hobbs Act was meant to stop just such conduct." *Green* at 526. The Court went on to observe "[w]e said in the *Local 807* case that racketeering affecting interstate commerce was within federal legislative control." *Id*. *Green* then cites *Cleveland v. United States,* 67 S.Ct. 13 (1946) (upholding Mann Act convictions for transporting a "plural wife across state lines" for purposes of cohabitation, stating "[t]he power of Congress over the instrumentalities of interstate commerce is plenary," *id*. at 16) and *Mitchell v. Vollmer & Co.*, 75 S.Ct. 860 (1955) (workers on project improving the Algiers Lock, a unit of the Gulf Intercoastal Waterway, are "engaged in commerce" for purposes of overtime under the FLSA; "the work of improving existing facilities of interstate commerce" is activity in commerce just as "[r]epair of facilities of interstate commerce is activity 'in commerce'").

[22]*Culbert* involved a Hobbs Act conviction for attempting to extort "$100,000 from a federally insured bank." *Id*. Cf. *Westfall v. United States*, 47 S.Ct. 629 (1927) (defrauding state bank which is a member of the Federal Reserve System is properly a federal offense). A divided Ninth Circuit panel had reversed the conviction because there was no evidence "that the attempted extortion of the bank assets related, in any way, to 'racketeering.'" *United States v. Culbert*, 548 F.2d 1355, 1357 (9th Cir. 1977). The Ninth Circuit reasoned that the Hobbs Act

In *Jones v. United States*, 120 S.Ct. 1904 (2000), the Court construed the federal arson statute, 18 U.S.C. § 844(i), as not extending to arson of a home insured by an out-of-state insurer, financed by an out-of-state lender, and furnished with gas from out-of-state, relying in part on the principle of avoiding a statutory construction under which "'grave and doubtful constitutional questions arise,'" and stating "[g]iven the concerns

carried forward the 1934 Act's antiracketeering purpose and that "[g]iven the applicable *de minimus* burden on interstate commerce rule . . . a contrary interpretation of the Act would justify usurpation of virtually the entire criminal jurisdiction of the states." *Id*. (the Ninth Circuit also relied on the similar conclusions of the Sixth Circuit in *United States v. Yokely*, 542 F.2d 300 (6th Cir. 1976)). The Supreme Court reversed the Ninth Circuit, holding that "racketeering" was not an element of an offense under the Hobbs Act, relying on several grounds: first, "[n]othing on the face of the statute suggests a congressional intent to limit its coverage to . . . 'racketeering'" and the relevant statutory words "do not lend themselves to restrictive interpretation," *id*. at 1113; second, the statute carefully defines terms, but makes no "reference to racketeering—much less any definition of the word," *id*. at 1114; third, making racketeering an element" might create serious constitutional problems, in view of the absence of any definition of racketeering in the statute," *id*.; fourth, the legislative history of the 1934 Act reflects that "Congress simply did not intend to make racketeering a separate, unstated element of an Anti-Racketeering Act violation," *id*. at 1115; fifth, the Hobbs Act's purpose was simply to correct the "perceived deficiency" in the 1934 Act (reflected by the *Local 807* case) and "that deficiency had nothing to do with the element of racketeering," *id*.; sixth, the rule of lenity did not apply, as it only applies "'when we are uncertain about the statute's meaning,'" *id*. at 1116; and seventh, Congress was well aware that state laws prohibited robbery and extortion. *Id*. at 1117. In the latter connection, we observe that the legislative history clearly indicates that the statements made regarding state law prohibition of robbery and extortion were directed at answering the criticism that the proposed Hobbs Act was anti labor and infringed the rights of labor (which was the major issue respecting the Act), the answer being that the proposed statute did not prohibit anything not already unlawful; the statements in no way related to the nature of the required interstate commerce nexus.

26

brought to the fore by *Lopez*, it is appropriate to avoid the constitutional question that would arise were we to read § 844(i) to render the 'traditionally local criminal conduct' in which petitioner Jones engaged 'a matter for federal enforcement.'" *Jones* at 1911, 1912. Accordingly, in *Jones*, the court read the words "used in" in section 844(i) as modifying "any activity affecting interstate . . . commerce," so that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity" within the meaning of section 844(i). *Id*. at 1908, 1910-11. However, the Hobbs Act contains no comparable special language upon which an analogous limiting construction can be focused. It does not at all differentiate between robberies which "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce." Thus, driven by the above noted language in *Stirone* and *Culbert,* we conclude that to determine whether the Hobbs Act applies to these offenses we must examine the limits of the commerce power as articulated by the Supreme Court in *Lopez* and *Morrison*.

II. *Lopez* and *Morrison* applied to this Hobbs Act prosecution

A. *Overview; Commerce Power Categories*

In *Lopez* the Court "identified three broad categories of activity that Congress may regulate under its commerce power," namely:

"First, Congress may regulate the use of the channels of interstate commerce" (citing, *inter alia*, *United States v. Darby*, 61 S.Ct. 451 at 457 (1941), sustaining statute prohibiting shipment

27

in interstate commerce of goods produced for interstate commerce by employees whose wages and hours do not conform to the requirements of the Fair Labor Standards Act; statute not invalid even if its motive was to regulate local wages not otherwise subject to commerce power).

"Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities" (listing as examples "'destruction of an aircraft,'" "'thefts from interstate shipments,'" and *Southern R. Co. v. United States*, 32 S.Ct. 2 (1914), upholding Safety Appliance Act equipment requirements as applied to cars of interstate carrier moving on interstate railroad line even though particular cars were carrying only intrastate traffic).

Third, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce . . . i.e. those activities that substantially affect interstate commerce. . . .

Within this final category, admittedly, our case law has not been clear whether an activity must 'affect' or 'substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. . . . We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez,* 115 S.Ct. 1624, 1629-30 (1995).

*Lopez* held unconstitutional, as beyond Congress's power under

the Commerce Clause, the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q) (1988 ed., Supp. V).  It "quickly disposed of" the first and second categories of congressional commerce power, noting that section 922(q) clearly fell within neither and that "if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce."  *Id*. at 1630.  It then went on to hold that the statute likewise could not be sustained under the third category, rejecting the Government's argument that "possession of a firearm in a local school zone does indeed substantially affect interstate commerce." *Id.* at 1632.

Some five years later in *Morrison* the Court reconfirmed *Lopez's* Commerce Clause analysis and holding as well as its articulation and description of the "'three broad categories of activity that Congress may regulate under its commerce power.'" *Morrison* at 1749.  *Morrison* held unconstitutional, as beyond Congress's power under the Commerce Clause, 42 U.S.C. § 13981, the civil action portion of the Violence Against Women Act of 1994.[23] *Morrison* observes that "[p]etitioners do not contend that these cases fall within either of the first two categories of Commerce Clause regulation.  They seek to sustain § 13981 as a regulation of activity that substantially affects interstate commerce. . . . [w]e agree that this is the proper inquiry."  *Id*. at 1749.  The Court held that section 13981 did not meet the requirements of the third *Lopez* category, stating "petitioners' reasoning would allow

---

[23]*Morrison* also held § 13981 beyond Congress's power under § 5 of the Fourteenth Amendment.  *Id*. at 1755 *et seq*.

Congress to regulate any crime so long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption," *Morrison* at 1752-53, contrary to the constitutionally required "distinction between what is truly national and what is truly local." *Id*. at 1754.[24]

B. *Lopez* category one.

This category-"use of the channels of interstate commerce"-is clearly inapplicable to the present offenses, and the Government does not contend otherwise.

C. *Lopez* category two.

The Government contends that these offenses fall within *Lopez* category two because, according to the Government, the victim stores were engaged in interstate commerce, relying on *United States v. Robertson*, 115 S.Ct. 1732 (1995), and that therefore no "substantial" effect on interstate commerce had to be shown.

For several reasons, we reject the Government's contention that these are *Lopez* category two offenses. To begin with, simply because a business is engaged to any extent in interstate commerce does not alone suffice to bring regulation of any and all conduct involving it within category two. That category applies to "instrumentalities of interstate commerce," such as "an aircraft" or a railroad line, and to "persons or things in interstate commerce," such as "thefts from interstate shipments." Plainly, a

---

[24]Unlike the situation in *Lopez*, Congress in enacting § 13981 specifically invoked its powers under section 8 of Article I of the Constitution, *Morrison* at 1748, and made numerous findings regarding the adverse impact of gender motivated violence on interstate commerce. *Id*. at 1752.

local retail store is not analogous to any of those.[25] The Government's argument would vastly expand *Lopez's* category two, extending federal jurisdiction on a *per se*, categorical basis to a broad range of matters such as shoplifting of a candy bar from any business engaged in interstate commerce or children scuffling in any such business's parking lot, and would also blur the distinction between categories two and three. Moreover, we note the Seventh Circuit's observation, rejecting the Government's attempts to fit a Hobbs Act prosecution into *Lopez* category two, that "[t]he Hobbs Act, however, falls within *Lopez* category three," at least where the conviction is sought to be sustained simply on the theory that the victim was engaged in interstate commerce. *See United States v. Peterson*, 236 F.3d 848, 856 (7th Cir. 2001).[26]

Nor do we agree that the Government's argument is supported by *Robertson*. There the defendant was convicted of "various narcotics offenses" and of violating 18 U.S.C. § 1962(a) (RICO) "by investing the proceeds of those unlawful activities in the 'acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect,

---

[25]We respectfully disagree with the apparently contrary conclusions of the divided panel in *United States v. Harrington*, 108 F.3d 1460, 1466, 1469-70 (D.C. Cir. 1997), and the seemingly similar suggestion in *United States v. Farmer*, 73 F.3d 836 at 843 (8th Cir. 1966).

[26]So far as concerns application of the Hobbs Act to violent interference with shipments actually moving or about to move in interstate commerce (reflected in its "or the movement of any article or commodity in commerce" prong, comparable to the 1934 Act's "or any article or commodity moving or about to move in trade or commerce" language)–which was plainly at least the Hobbs Act's primary purpose–*Lopez* category two would doubtless be the appropriate category. Obviously, that is not the case here.

31

interstate or foreign commerce.'" *Id*. at 1732. The Ninth Circuit, in a pre-*Lopez* decision, affirmed the narcotics convictions but reversed the RICO conviction, holding that the RICO enterprise–an Alaskan gold mine–was not shown to have "had more than an incidental effect on interstate commerce" and hence did not meet section 1962(a)'s "the activities of which affect, interstate . . . commerce" requirement (without addressing the "engaged in . . . interstate commerce" prong of section 1962(a)). *United States v. Robertson*, 15 F.3d 862, 868 (9th Cir. 1994). The Ninth Circuit did not even mention, let alone discuss, the Commerce Clause or the limits of Congress's power thereunder. The Supreme Court, shortly after *Lopez*, reversed the Ninth Circuit's reversal of the RICO count, holding there was sufficient evidence that the gold mine was "engaged in . . . interstate . . . commerce" for purposes of section 1962(a). *Robertson*, 115 S.Ct. at 1733. It stated in this connection:

> ". . . Robertson, who resided in Arizona, made a cash payment of $125,000 for placer gold mining claims near Fairbanks. He paid approximately $100,000 (in cash) for mining equipment and supplies, some of which were purchased in Los Angeles and transported to Alaska for use in the mine. Robertson also hired and paid the expenses for seven out-of-state employees to travel to Alaska to work in the mine. . . . He again hired a number of employees from outside Alaska to work in the mine.
>
> . . .
>
> Furthermore, Robertson, the mine's sole proprietor, took $30,000 worth of gold, or 15% of the mine's total output, with him out of the State.
>
> Whether or not these activities met (and whether or not, to bring the gold mine within the 'affecting commerce' provision of RICO, they would *have* to meet) the requirement of substantially affecting interstate commerce, they assuredly brought the gold mine within §

32

1962(a)'s alternative criterion of 'any enterprise . . . engaged in . . . interstate or foreign commerce.'" *Id*.

*Robertson* is a statutory construction case and does not purport to make any constitutional holding or to address (or recognize as being potentially before it) any constitutional issue, and it does not mention *Lopez* or discuss its three categories of Commerce Clause power.[27]

Finally, and in any event, we reject the underlying premise of the Government's argument in this connection, namely that the victim stores here were "engaged in" interstate commerce as the *Robertson* Court understood and intended that phrase. *Robertson's* principal illustrations of what is, and what is not, "engaged in [interstate] commerce" are as follows:

> "the Government proved that some . . . [equipment and supplies] were purchased in California and transported to Alaska for use in the mine's operations. *Cf. United States v. American Building Maintenance Industries*, 422 U.S. 271, 285, 95 S.Ct. 2150, 2159, 45 L.Ed.2d 177 (1975) (allegation that company had made *local* purchases of equipment and supplies that were merely *manufactured* out of state was insufficient to show that company was "engaged in commerce" within the meaning of § 7 of the Clayton Act).
>
> . . .
>
> As we said in *American Building Maintenance*, a corporation is generally 'engaged "in commerce"' when it is itself '*directly* engaged in the production, distribution, or acquisition of goods and services in interstate commerce.' *Id*., at 283, 95 S.Ct., at 2158."

---

[27]Moreover, it is not clearly apparent that Congress's power to criminalize an offender's use of the proceeds of his federal narcotics offenses to invest in, establish or operate an enterprise is necessarily dependent on the enterprise being otherwise subject to Congress' power under the Commerce Clause. *See*, *e.g.*, *United States v. Owens*, 996 F.2d 59, 61 (5th Cir. 1993).

In *American Building Maintenance* the Court held summary judgment was properly granted that the Benton janitorial service companies, located in California, were not "engaged in [interstate] commerce," for purposes of section 7 of the Clayton Act, stating:

> "[T]he Benton companies performed a substantial portion [80% to 90%] of their janitorial services for enterprises which were themselves clearly engaged in selling products in interstate and international markets and in providing interstate communication facilities. But simply supplying localized services [in California] to a corporation engaged in interstate commerce does not satisfy the "in commerce" requirement of § 7.
>
> To be engaged "in commerce" within the meaning of § 7, a corporation must itself be *directly* engaged in the production, distribution, or acquisition of goods or services in interstate commerce.
>
> . . .
>
> Similarly, although the Benton companies used janitorial equipment and supplies manufactured in large part outside of California, they did not purchase them directly from suppliers located in other States. [citation] Rather, those products were purchased in intrastate transactions from local distributors. . . . By the time the Benton companies purchased their janitorial supplies, the flow of commerce had ceased. See *Schechter Corp. v. United States*, 295 U.S., at 542-543, 55 S.Ct. at 848." *Id.*, 2158-59 (emphasis added; footnote omitted).

Here there is no evidence that any of these local retail stores made any sales other than at the store premises in Fort Worth or any sales to any person or entity engaged in interstate commerce, or had any operations, facilities or employees outside of Fort Worth; nor is there any evidence that any of them acquired any of their merchandise inventory other than from in-state wholesalers.[28]

---

[28]It is true that Quickway Shopping (one of which stores was robbed of $50) sold some money orders which it purchased from a company in Minnesota. But given that there is no evidence that amount of these was other than insignificant–either absolutely or as fraction of the store's total sales–we hold that this does not

If the Benton companies were not "engaged in" interstate commerce, it necessarily follows, *a fortiori*, that these local retailers were not.

D. *Lopez* category three.

We accordingly conclude that the issue of whether the Hobbs Act is properly applied to these robberies turns on whether such application meets the test of *Lopez* category three, as to which "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id*. at 1630.

The evidence does not reflect any *particular*, *concrete* effect on interstate commerce that in fact *actually* resulted from any of the four robberies. But the evidence does support the conclusions that the victim stores each regularly used their funds to, among *other* things, purchase from local wholesalers inventory which *included* (but was *not* shown to be limited to) items manufactured out-of-state, and that the robberies reduced, by the amounts taken ($50, $100, $145, $1,500-2,000), the funds the stores would, but for the robbery, otherwise thereafter have had available for use in (or withdrawal from) their respective businesses, *including* (but *not* limited to) use for inventory purchasing. The evidence also shows that any reduction in a retailer's purchases from its wholesaler would reduce the funds the wholesaler would otherwise

---

constitute Quickway Shopping as being engaged in interstate commerce, certainly not for purposes of bringing the robbery of it within *Lopez* category two. *Cf. American Building Maintenance* at 2153 and notes 3 and 4 (referring to "negligible" use of interstate facilities and "insignificant" interstate purchases).

thereafter have had available for use in (or withdrawal from) its business, *including* (but *not* limited to) use for purchase of out-of-state merchandise. Cf. *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) ("To establish a *de minimis* effect on interstate commerce, the Government need not show that a defendant's acts actually affected interstate commerce . . . . Rather, the jurisdictional requirement is satisfied 'by proof of a probable or potential impact'"). Assuming that all this suffices to show that each individual robbery did probably or potentially have some minimal, attenuated and indirect affect on interstate commerce, it is clear that none individually had what could fairly be described as a "substantial" affect (actual, probable or potential).

The Government in this connection relies on the "aggregation" principle under which in determining whether the affect on interstate commerce is "substantial" the focus is not upon any one individual instance of the activity covered by the regulation but is rather upon whether the aggregate of all covered instances as a whole substantially affects interstate commerce. The validity of that general principle has long been clearly established, and is recognized in both *Lopez* and *Morrison*. At the same time, however, each of those decisions holds that the principle is not of universal or unlimited application, and refused to apply it to sustain the statutes there under consideration. Thus, in *Morrison* the Court recognized that the aggregate of instances of gender-motive violence within the scope of section 13981 did ultimately have a large effect on interstate commerce, *id.* at 1752, but

36

nevertheless held that the aggregation principle could not be applied, stating:

> "We accordingly reject the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. . . . The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id*. at 1754.

The central question in this case, then, is whether this Hobbs Act prosecution can be sustained under the aggregation theory. We now turn to that question.

E. Hobbs Act jurisdictional element.

Because the Hobbs Act has an interstate commerce related jurisdictional element and the statutes at issue in *Lopez* and *Morrison* contained no comparable provision, as the Supreme Court's opinions in those cases emphasized, some of our sister circuits have relied on this distinction (among other considerations) in holding that *Lopez* and *Morrison* are either largely inapplicable to Hobbs Act cases, or do not require that a substantial effect on interstate commerce be shown in Hobbs Act prosecutions falling under *Lopez* category three.[29] We respectfully disagree. Such an approach would in effect either create a fourth category of commerce clause power, contrary to the plainly comprehensive three category approach taken in *Lopez* and *Morrison*, or would do away with the "substantially affect" requirement which those opinions so

---

[29]*See United States v. Gray*, 260 F.3d 1267, 1274 (11th Cir. 2001); *United States v. Malone*, 222 F.3d 1286, 1295 (10th Cir. 2000). *See also United States v. Harrington*, 108 F.3d 1460, 1465 (D.C. Cir. 1997).

clearly state is constitutionally mandated in category three cases. Congress lacks the power to provide for a *lesser* relation to interstate commerce in *that* category of case simply by including a jurisdictional provision. Otherwise the principles enunciated in *Lopez* and *Morrison* would be essentially meaningless. We agree with the Seventh Circuit's observations in this respect in *United States v. Wilson*, 73 F.3d 675, 685 (7th Cir. 1995).[30]

This is not to say that the Hobbs Act jurisdictional element serves no function. It allows a determination in each case, based on its particular facts and characteristics, whether in that case application of the statute is consistent with Congress's Commerce Clause power. Because of that jurisdictional element the statute is not properly subject to being facially invalidated, which was essentially the result in *Lopez* and *Morrison* where the statutes involved lacked any jurisdictional element.

---

[30]The *Wilson* court stated: "In discussing the lack of a jurisdictional element *in Lopez*, *the court simply did not state or imply* that all criminal statutes must have such an element, or *that all statutes with such an element would be constitutional*, or that any statute without such an element is per se unconstitutional." *Id*. (emphasis added). We quoted that sentence from *Wilson* with approval in *United States v. Bird*, 124 F.3d 667, 675 (5th Cir. 1997).

Moreover, several decisions have indicated that *Lopez* and/or *Morrison* preclude most Hobbs Act prosecutions for robberies of individuals. *See United States v. Lynch*, 282 F.3d 1049, 1052-55 (9th Cir. 2002); *United States v. Wang*, 222 F.3d 243, 239-40 (6th Cir. 2000); *United States v. Collins*, 40 F.3d 95, 100-101 (5th Cir. 1994) (applying this Court's decision in *Lopez*, 2 F.3d 1342 (5th Cir. 1993), later affirmed by the Supreme Court). *See also United States v. Quigley*, 53 F.3d 908, 910 (8th Cir. 1995) (relying on *Collins*). Obviously, these decisions proceed on the assumption that *Lopez* and/or *Morrison* speak to Hobbs Act prosecutions in *Lopez* category three cases notwithstanding the presence of a jurisdictional element in the Hobbs Act and the absence of such an element in the statutes involved in *Lopez* and *Morrison*.

F.   Regulation of commercial or economic activity.

Some of our sister circuits have held that the refusal of *Lopez* and *Morrison* to apply the aggregation principle to sustain the statutes there under consideration is wholly inapplicable to the Hobbs Act because those statutes proscribed offenses which were not commercial or economic while robbery (or extortion, but we here deal only with robbery), which the Hobbs Act proscribes, is a commercial or economic activity as it always involves taking "personal property" from another person. § 1951(b)(1).  *See United States v. Gray*, 260 F.3d 1267, 1274 (11th Cir. 2001) ("Unlike the statute at issue in *Morrison*, the Hobbs Act plainly and undeniably regulates economic activity"); *United States v. Malone*, 222 F.3d 1286, 1295 (10th Cir. 2000) ("Unlike the statutes at issue in *Morrison* and *Lopez*, the Hobbs Act regulates economic activity"). *But see United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001) (". . . the Hobbs Act does not suggest that robbery is an economic activity").

We respectfully take a somewhat different view of the matter.

The approach of these cases seems to be that whenever the regulated activity is "economic," then, for purposes of *Lopez* category three cases, there are never any limits whatever to use of the aggregation theory and it may always be employed to satisfy (and as practical matter *will* always satisfy) the "substantially" affects requirement of *Lopez* category three.[31]  While this would

---

[31]Where only *Lopez* categories one or two are involved, a showing of "substantially affects" is not required, and so whether aggregation is available is generally irrelevant.

seem, at least as a *practical* matter, to limit *Lopez* category three to cases where the regulated activity was non-economic and to obliterate any distinction in "economic" cases between the *Lopez* categories, we need not and do not reach that issue.

Assuming, *arguendo*, that there is a class of category three cases as to which there are no restraints whatever on aggregation, we conclude that such a class would *exclude* instances where "the regulated activity" is *not* properly described as "commercial" or "economic" *in the same general sense* as "commercial."[32]

*Lopez* and *Morrison* each refer to both "commercial" and "economic" activities and appear to use the terms synonymously. Thus *Lopez* states that section 922(q) does not "regulate[] a commercial activity" *id*. at 1626 (quoted in *Morrison id*. 1750), and that

> "Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a *commercial transaction*, which viewed in the aggregate, substantially affects interstate commerce," *id*. at 1631 (emphasis added),

and that

---

[32]If "the regulated activity" is not "commercial" (or the regulation does not govern the conduct of a wholly or partially commercial enterprise or endeavor), that means merely that, in *Lopez* category three cases where there must be a "substantially affects" showing, then, whether or not aggregation is available depends on the considerations elaborated on in G below and in Judge Higginbotham's *Hickman* dissent. We need not and do not address whether such considerations (or similar ones) govern or limit the availability of aggregation for such purpose where the regulated intrastate activity is "commercial" (or the regulation does govern the conduct of a wholly or partially commercial enterprise or endeavor).

40

> "We do not doubt that Congress has authority under the Commerce Clause to *regulate* numerous *commercial activities* that substantially affect interstate commerce and also affect the educational process. . . . Admittedly, a determination *whether an* intrastate *activity* is *commercial or noncommercial* may in some cases result in legal uncertainty."  *Id*. at 1633 (emphasis added).

The last sentence above quoted is likewise quoted in *Morrison*.  *Id*. at 1750.  Justice Kennedy, in his concurring opinion in *Lopez* (joined in by Justice O'Connor and joining in Chief Justice Rehnquist's opinion for the Court) states:

> "Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with *the regulation* of *commercial activities,* the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."  *Id*. at 1638 (emphasis added).

The above passage is likewise quoted with approval in *Morrison*. *Id*. at 1750.

And, since what we are concerned with is the power of Congress under the Commerce Clause–the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"–"commercial" rather than simply any broadly understood concept of "economic" seems to be the appropriate concept.

Robbery is the "activity" regulated by the Hobbs Act, and we conclude that for these purposes robbery cannot be considered a commercial activity.  Robbery does have an economic effect.  But so, too, do not only all thefts of any kind from any victim but also, for example, virtually all criminal homicides.  Moreover, the here relevant portion of the Hobbs Act, apart from simply specifying that the accused have committed a "robbery" which "in

41

any way or degree . . . affects commerce" (although not requiring any intention to have or foreknowledge of such an effect), says nothing whatever about the identity, status or activity (whether as being engaged in any sort of commercial activity or otherwise) of either the victim or the robber, and does not purport to in any way regulate the conduct of any commercial activity. What is relevant in this connection under *Lopez* and *Morrison* is not the *effects* of the conduct which the statute proscribes but whether the statute may fairly be said to regulate commercial activity. The here relevant portion of the Hobbs Act cannot.

We recognize that some decisions have taken the view that "the Hobbs Act regulates the interference with economic activity by robbery," *Peterson* at 852, and for that reason alone an aggregation analysis is always *per se* appropriate and all that needs be shown is a depletion of assets. *Id*. ("what is aggregated is the depletion of the interstate entity's assets by robbery"). *See also Gray* at 1274 ("Economic activity, or more precisely the infliction of economic harm, is at the heart of the Hobbs Act's prohibition on robbery"). However, as noted, the here relevant portion of the Hobbs Act says nothing about the victim being an "interstate entity."[33] And, we are aware of no Commerce Clause case in which the Supreme Court has applied the aggregation principle to a class of activities where contours of the class are not reasonably inferable from the language of the challenged statute or regulation. Moreover, the approach of allowing aggregation simply

_____

[33]Nor may the victims here be properly so characterized. See part IIC, *supra*.

42

because of "the infliction of economic harm" (or the "depletion of . . . assets") equally supports making a federal offense of any crime (say any criminal homicide or assault producing serious bodily injury) so long as it causes economic harm or depletes economic resources and hence in some way or degree affects interstate commerce-in the same sense as does a fifty dollar robbery or a fifty cent shoplifting from a victim (whether an individual or a local retailer) who purchases items made in another state-and so long as the aggregate effect of all such crimes on interstate commerce is substantial. Yet, *Morrison* rejects the notion that Congress may regulate a crime simply because "the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id*. at 1752-53. *Lopez* and *Morrison* reflect that such a limitation on the aggregation principle is necessary because "[t]he Constitution requires a distinction between what is truly national and what is truly local," and "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id*. at 1754. Certainly, none of the instant robberies can be characterized as "directed at the instrumentalities, channels, or goods involved in interstate commerce."[34] Further, the several decisions refusing to find the

---

[34]And, the here relevant portion of the Hobbs Act, denouncing any "robbery" which "in any way or degree . . . affects commerce" is in no way limited to robberies "directed at the instrumentalities, channels, or goods involved in interstate commerce."

43

Hobbs Act applicable to most robberies of individuals under theories of deletion of assets and aggregation of the effect on interstate commerce of all such robberies likewise support our view in this respect.[35] It has been said that this distinction is justified because "in general . . . businesses purchase on a larger scale than individuals." *United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir. 1982). However, this justification is not persuasive because the here relevant portion of the Hobbs Act makes no distinction between the robberies it proscribes on the basis of whether the victim is a business (or is engaged in a commercial activity), and because virtually every consumer regularly expends considerable funds on the purchase of items originating out-of-state and there are many more consumers than businesses. Indeed, consumer spending is generally estimated to amount to two-thirds of the national economy. *See also United States v. Thomas*, 159 F.3d 296, 298 (7th Cir. 1998) ("since the aggregate effect of such

_____

[35]See *United States v. Lynch*, 282 F.3d 1049, 1054 (9th Cir. 2002) (". . . robbery does have an economic component; however, that economic component must rise above the simple, though forced, economic transaction between two individuals. Otherwise, almost every violent property crime would be transformed into a federal offense, contrary to the teachings of *Morrison*"); *United States v. Wang*, 222 F.3d 234, 239-40 (6th Cir. 2000) (restaurant owner robber of $4,200 by former employee; of $4,200 taken $1,200 had been withdrawn that day from restaurant with intent to deposit it in the restaurant bank account the next day; restaurant purchased meat from out-of-state suppliers; not covered by Hobbs Act, citing *Morrison*); *United States v. Quigley*, 53 F.3d 908, 910 (8th Cir. 1995); *United States v. Collins*, 40 F.3d 95, 100-101 (5th Cir. 1994) (robbery of Mercedes-Benz automobile, cell phone, cash, jewelry and clothes); *United States v. Buffey*, 899 F.2d 1402 (4th Cir. 1990) ($20,000 extortion); *United States v. Matson*, 671 F.2d 1020 (7th Cir. 1982) ($3,000 extortion); *United States v. Merolla*, 523 F.2d 51 (2d Cir. 1975) (extortion of contractor by owner).

robberies [of individuals] on commerce is non-trivial, those cases are in tension with the ones . . . which insist on aggregation"). Moreover, as previously noted, we are aware of no Supreme Court Commerce Clause decision applying the aggregation principle to a class of activities the contours of which are not reasonably inferable from the language of the challenged statute or regulation. Thus, the aggregation principle if applied to Hobbs Act prosecutions, would apply *all* robberies (of *any* personal property, from *any* victim, by any robber) which "in any way or degree . . . affect[s] commerce."

We turn now to the appropriate standards to determine whether in such a case the applicable *Lopez* category three "substantially affects" requirement can be met by aggregating the effects of all such robberies.

G. Aggregation and the Hobbs Act

As previously observed, the aggregation principle has relevance only in *Lopez* category three cases, cases that are concerned only with regulation of intrastate conduct. As to such regulation, *Lopez's* explicit requirement that the regulated intrastate conduct not merely affect interstate commerce but that it do so "substantially" is obviously designed to insure that congressional power under the Commerce Clause is not wholly without meaningful limits and does not obliterate the "distinction between what is truly national and what is truly local," *id*. at 1634, so as to transform to a unitary system of government the constitutionally established federal system under which, among other things, there is "no better example of the police power, which the Founders

45

denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison* at 1754. Yet if there are essentially no limits on use of the aggregation principle to satisfy the "substantially" requirement, then that requirement becomes virtually meaningless and wholly incapable of performing the function it is designed to serve, for the greater the breadth and generality of the regulatory net which Congress casts over intrastate conduct the more "substantial" will be the aggregated affect on interstate commerce of the total of all the intrastate conduct so regulated. Moreover, if the aggregation principle is applicable "the courts have no power 'to excise, as trivial, individual instances' of the class" being aggregated. *Perez v. United States*, 91 S.Ct. 1357, 1361 (1971) (quoting *Maryland v. Wirtz*, 88 S.Ct. 2017, 2022 (1968)).

Although the Supreme Court has on several occasions sustained federal statutes on the aggregation theory, it has never applied or even referred to it in a Hobbs Act case (nor is anything in the Hobbs Act legislative history supportive of such an approach). Nor since *Lopez* and *Morrison* has the Court made any general analysis or explanation of the contours of the doctrine.

In *United States v. Robinson*, 119 F.3d 1205 (5th Cir. 1997), we rejected an as-applied challenge to a Hobbs Act conviction which urged that under *Lopez* the evidence was insufficient because it showed only that the charged robberies had some, but not a substantial, effect on interstate commerce.[36] We rejected that

_____

[36]*Robinson* involved one conspiracy and three substantive counts involving retail store robberies. The victim "stores

46

contention, relying on the "aggregation principle" as reflected by cases such as *Wickard v. Filburn*, 63 S.Ct. 82 (1942), *Katzenbach v. McClung*, 85 S.Ct. 377 (1964) and *Heart of Atlanta Motel v. United States*, 85 S.Ct. 348 (1964), held that "*Lopez* did not undermine

this principle" and relied in that connection on the Tenth Circuit's decision in *United States v. Bolton*, 68 F.3d 396 (1995). *Robinson*, 1214-15.

Subsequently, in *United States v. Hickman*, 151 F.3d 449 (5th Cir. 1998) (panel opinion), 179 F.3d 230 (5th Cir. 1999) (en banc), we again addressed the requisite interstate commerce connection respecting Hobbs Act convictions for several robberies of retail establishments. The *Hickman* panel affirmed the convictions, considering itself bound by *Robinson*, but expressed "serious questions" as to the propriety of applying the aggregation principle in that setting.[37] The en banc court noted that "[b]y

provided check-cashing services . . . the stores cashed out-of-state checks, payroll checks, and government benefit checks . . . several of the stores sold products that had been shipped to Texas from other states. The victims . . . suffered substantial losses as a result of the robberies: one store was forced to close permanently for lack of capital, and the others were unable to cash checks for a finite period of time." *Id*. at 1208. "[T]hese robberies caused business losses of approximately $5,000 each" to two different victims and "$60,000" to a third. *Id*. at 1209.

[37]The panel opinion states:
"A review of Supreme Court authority raises serious questions regarding whether aggregation principles can be used as the commerce clause jurisdictional hook under the Hobbs Act when the underlying crimes arise from a purely local crime spree. . . . These local robberies are not the sort of economic activity that can legitimately be viewed in the aggregate for traditional economic impact analysis purposes. The conceptual difference between the consumption of home-grown wheat that might otherwise have been sold on the

means of an equally divided en banc court, we affirm the counts of conviction," but no opinion for affirmance was issued. *Hickman*, 179 F.3d 230. Half the judges comprising the en banc court joined in a dissenting opinion by Judge Higginbotham urging reversal on the basis that, particularly in light of *Lopez*, the aggregation principle was not properly applicable to those Hobbs Act prosecutions. *Id*.

Given the intervening decision in *Morrison* we revisit that issue and now express our essential agreement with the conclusions and underlying reasoning of Judge Higginbotham's *Hickman* opinion.[38] As stated in that opinion:

> "We would hold that substantial effects upon interstate commerce may not be achieved by aggregating diverse, separate individual instances of intrastate activity where there is no rational basis for finding sufficient connections among them. Of course, Congress may protect, enhance, or restrict some particular interstate economic market, such as those in wheat, credit, minority travel,

---

> open market, *see Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), or denying service in a restaurant to a particular race of interstate travelers, *see Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), and a string of local robberies is apparent. We, however, are bound by circuit law. *See United States v. Robinson*, 119 F.3d at 1208. *Robinson* constitutes clear circuit precedent for the application of aggregation to this local non-economic activity, thereby setting the commerce clause jurisdictional hook." *Id*. at 456.

[38]We recognize decisions of our sister circuits that continue after *Morrison* to apply an aggregation analysis to Hobbs Act prosecutions. *See, e.g., United States v. Elias*, 285 F.3d 183, 188-89 (2d Cir. 2002); *United States v. Gray*, 260 F.3d 1267, 1273-74 (11th Cir. 2001); *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001); *United States v. Malone*, 222 F.3d 1286, 1294-95 (10th Cir. 2000). *But see United States v. Lynch*, 282 F.3d 1049, 1054 (9th Cir. 2002); *United States v. Wang*, 222 F.3d 234, 240 (6th Cir. 2000). For the reasons stated herein, we respectfully view the matter differently.

abortion service, illegal drugs, and the like, and Congress may regulate intrastate activity as part of a broader scheme.  The Hobbs Act is not a regulation of any relevant interstate economic market, nor are there other rational connections among nationwide robberies that would entitle Congress to make federal crimes of them all.

The Hobbs Act does not target any class of product, process, or market, or indeed even commercial victims. It facially applies to any robbery, or its attempt, of any person or entity. . . . The Hobbs Act offers no 'regulatory scheme' which 'could be undercut' if individual robberies were not aggregated. . . . Thus, putting aside robberies as part of an effort to regulate particular interstate markets such as guns, drugs, or organized crime syndicates, a local robbery spree can be within Congress's power only if it by itself has a substantial effect."  *Id.* at 231.

. . .

"Where Congress has sought to regulate-protect, enhance, or restrict-some particular market such as wheat, credit, minority travel, or abortion service, it has pointed the way to a rational aggregation test.  It has identified those things that affect that market, things which if not all subject to the regulation would erode the effort. Intrastate production and sales can be aggregated, because the prices of goods and services are determined in interstate markets.  If, for example, the federal government enacts a price control to ensure sufficient income for producers, it will be thwarted if consumers switch to buying goods in intrastate commerce or produce the goods themselves.  Because the instances of economic activity are intimately connected and in the aggregate substantially affect commerce, Congress can regulate such activity."  *Id.* at 233.

We also observe that not only does the Hobbs Act "not target any class of product, process or market or even commercial victims," but it has also been held to apply to robbery (or extortion) which adversely affects *ill*egal commerce[39] as well as to

---

[39]*See, e.g.*, *United States v. Peterson*, 236 F.3d 848, 854 (7th Cir. 2001) ("the Hobbs Act does not require that the commerce affected be legal commerce"); *United States v. Jones*, 30 F.3d 276, 286 (2d cir. 1994); *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984) (Hobbs Act properly "read to punish extortion that promotes illegal commerce as well as extortion that retards legal commerce").  *See also, e.g., United States v. Bailey*, 227 F.3d 792, 798 (7th Cir. 2000) ("robbery of cocaine

49

that which *beneficially* affects commerce.[40]

The analysis in the *Hickman* en banc dissent fully comports with the following crucial passage in *Lopez* explaining the Court's refusal to sustain 18 U.S.C. § 922(q) under an aggregation theory, viz:

> "Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, *therefore*, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id*. at 1631 (emphasis added).

Where the Supreme Court has applied aggregation to uphold federal regulation of intrastate conduct against constitutional challenge under the Commerce Clause, there has always been a rational basis to find sufficient interrelationship or commonality of effect on interstate commerce among the discrete intrastate instances regulated and between them and a scheme of regulation (protection, enhancement or restriction) of some particular interstate market or activity such that the regulation of those intrastate activities can rationally be viewed as necessary to the effectiveness of or a meaningfully supporting part of the scheme of

---

dealers generally has an effect on commerce" for purposes of Hobbs Act).

[40]*See, e.g., United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001) (under Hobbs Act "the effect on interstate commerce is not limited to only adverse effects"); *United States v. Kaplan*, 171 F.3d 1351, 1357 (11th Cir. 1999) (Hobbs Act "intended to protect commerce from any and all forms of effect, whether they are . . . beneficial or adverse"); *United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir. 1982) ("Even a beneficial effect on interstate commerce, e.g., facilitating the flow of building materials across state lines, is within the prohibition of the statute").

regulation of that particular interstate activity or market.

We now turn to the most frequently cited of these cases.

*Wickard v. Filburn*, 63 S.Ct. 82 (1942), involved a farmer who "owned and operated a small farm . . . maintaining a herd of dairy cattle, selling milk, raising poultry, and selling poultry and eggs" and raising "a small acreage of winter wheat." *Id*. at 84. He sold part of the wheat, fed part to his poultry and cattle, some of which were sold, used some for seeding and some in making flour for home consumption. In the year in question his wheat "available for marketing" quota under the Agricultural Adjustment Act of 1938 as amended was 11.1 acres but he harvested and threshed 23 acres and was penalized 49 cents a bushel on the 239 bushels harvested and threshed from the 11.9 acres of excess acreage. *Id*. at 83, 84, 86.[41] The Court assumed that this excess was consumed on the farm, but nevertheless, and despite the comparatively minimal quantity, sustained the penalty as against Commerce Clause challenge, stating, *inter alia*,

> "The effect of consumption of home-grown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop.
> . . .
> One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as *home-consumed wheat would have a substantial influence on price and market conditions*. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising

---

[41]Wheat not threshed was not considered "available for marketing" and could without penalty be cut and cured or fed as hay or reaped and fed with the head and straw together. *Id*. at 93.

prices tends to flow into the market and check price increases.  But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense *competes with wheat in commerce. . . .* Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation *would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices.*
. . .
Control of total supply, upon which the whole statutory plan is based, *depends* upon control of individual supply."  *Id*. at 90-91 (emphasis added).

We note that *Lopez* describes *Wickard* as "perhaps the most far reaching example of Commerce Clause authority over intrastate commerce."  *Lopez* at 1630.  Clearly, however, the factors that brought *Wickard* under the aggregation principle are absent in the present character of prosecution.  In *Wickard* market forces related the effect of the individual instances of regulated intrastate conduct to each other and to the scheme of regulation of the particular interstate market, namely sustaining the price at which wheat was sold in interstate commerce; moreover, the diverse instances of regulated intrastate conduct in *Wickard* each had a similar effect on the regulatory scheme, that is each had the same tendency to affect the interstate price of wheat in the same way.

Likewise, in *United States v. Wrightwood Dairy Co.*, 62 S.Ct. 523 (1942), the Court upheld a regulation prescribing the minimum price to be paid producers for all milk marketed in the Chicago area, approximately forty percent of which came from out-of-state, rejecting the contention that the regulations could not under the Commerce Clause be applied to a local milk marketer all of whose business was entirely intrastate.  The Court explained:

52

> ". . . the marketing of intrastate milk which competes with that shipped interstate would tend seriously to break down price regulation of the latter.
>
> . . .
>
> We conclude that the national power to regulate the price of milk moving interstate into the Chicago, Illinois, marketing area, extends to such control over intrastate transactions there as is necessary and appropriate to make the regulation of the interstate commerce effective; and that it includes authority to make like regulations for the marketing of intrastate milk whose sale and competition with the interstate milk affects its price structure so as in turn to affect adversely the Congressional regulation." *Id*. at 527.

The decisions in *Heart of Atlanta Motel v. United States*, 85 S.Ct. 348 (1964), and *Katzenbach v. McClung*, 85 S.Ct. 377 (1964), sustained under the Commerce Clause the public accommodation provisions of Title II of the Civil Rights Act of 1964 applicable to hotels and restaurants respectively. In doing so the Court in each case pointed to the overwhelming evidence before Congress in its consideration of the legislation that racial discrimination by hotels and restaurants impeded minority interstate travel. In *Heart of Atlanta* the Court noted that the Committee Reports and testimony before Congress reflected that:

> "[O]ur people have become increasingly mobile with millions of people of all races traveling from State to State; that Negroes in particular have been the subject of discrimination in transient accommodations, having to travel great distances to secure the same; that often they have been unable to obtain accommodations and have had to call upon friends to put them up overnight, . . . and that these conditions had become so acute as to require the listing of available lodging for Negroes in a special guidebook . . . that this uncertainty [of the Negro traveler finding lodging] stemming from racial discrimination had the effect of discouraging travel on the part of a substantial portion of the Negro community. This was the conclusion not only of the Under Secretary of Commerce but also of the Administrator of the Federal Aviation Agency who wrote the Chairman of the Senate Commerce Committee that it was his 'belief that air commerce is adversely affected by the denial to a

53

substantial segment of the traveling public of adequate and desegregated public accommodations.' . . . We shall not burden this opinion with further details since *the voluminous testimony presents overwhelming evidence that discrimination by hotels and motels impedes interstate travel*." *Id*. at 355 (emphasis added).[42]

The Court went on to hold that interstate travel was interstate commerce under the Commerce Clause and that accordingly Congress's commerce power embraced the power to remove the impediment to interstate travel posed by race based refusal to serve hotel customers. *Id*. at 355-360. *McClung* similarly placed great emphasis on the same consideration, *id*. at 381-82,[43] and goes on to hold that the fact that one restaurant's activities may have but a *de minimus* effect on interstate commerce was not significant, relying on *Wickard*. *McClung* at 382.

---

[42]The portion of the above quotation up through the reference to "a special guidebook" is quoted in *Perez v. United States*, 91 S.Ct. 1357, 1361 (1971), as explanatory of the decision in *Heart of Atlanta*.

[43]*McClung* states:

". . . there was an impressive array of testimony that *discrimination in restaurants had a direct and highly restrictive effect upon interstate travel by Negroes*. This resulted, it was said, because discriminatory practices prevent Negroes from buying prepared food served on the premises while on a trip, except in isolated and unkempt restaurants and under most unsatisfactory and often unpleasant conditions. This obviously discourages travel and obstructs interstate commerce for one can hardly travel without eating. Likewise, it was said, that discrimination deterred professional, as well as skilled, people from moving into areas where such practices occurred and thereby caused industry to be reluctant to establish there." *Id*. at 381-82 (emphasis added).

This passage from *McClung* is likewise quoted in full in *Perez v. United States*, 91 S.Ct. 1357, 1361 (1971), as explanatory of the decision in *McClung*.

54

In *Heart of Atlanta* and *McClung* the discrete local activities regulated–the race based refusal of diverse hotels and restaurants to serve minority customers–each had a similar effect on a particular interstate market or activity, namely impeding minority interstate travel, an obstruction to interstate commerce which the statute was designed to remove.

*Maryland v. Wirtz*, 88 S.Ct. 2017 (1968),[44] rejected Commerce Clause challenges to the 1961 amendments to the Fair Labor Standards Act adopting the "enterprise concept" extending coverage to include not only employees personally engaged in interstate commerce or in the production of goods for interstate commerce, but also *all* those employed by "an enterprise" engaged in interstate commerce or in the production of goods for interstate commerce. The Court noted that in the original act Congress had found that "substandard wages and excessive hours, when imposed on employees of a company shipping goods into other States, gave the exporting company an advantage over companies in the importing States" and that this had the "undesirable effect of driving down labor conditions in the importing States." *Id*. at 2020.[45] The Court went on to state:

---

[44]*Wirtz* was overruled on other grounds in *National League of Cities v. Usery*, 96 S.Ct. 2465 (1975), which was in turn overruled in *Garcia v. San Antonio Metropolitan Transit Authority*, 105 S.Ct. 1005 (1985).

[45]*See also id*. n.12 quoting congressional finding that substandard labor conditions "in industries engaged in commerce or in the production of goods for commerce . . . causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States."

> "When a company does an interstate business, its competition with companies elsewhere is affected by all its significant labor costs, not merely by the wages and hours of those employees who have physical contact with the goods in question." *Id*. at 2021.

*Wirtz* also noted that Congress had found that substandard labor conditions tended to labor disputes and strikes, "that when such strife disrupted businesses involved in interstate commerce, the flow of goods in commerce was itself affected," *id*. at 2021, and that this applied equally to substandard labor conditions of all employees of an enterprise engaged in commerce, not merely those personally so engaged. *Id*. at 2021-22. *Wirtz* goes on to state that under the Commerce Clause courts could not "excise, as trivial, individual instances falling within a rationally defined class of activities," citing *Wickard*. *Wirtz* at 2022.

The intrastate activities regulated in *Wirtz* (wages of employees of an enterprise engaged in interstate commerce or in the production of goods for or acquisition of goods directly in interstate commerce even where the employee personally was not so engaged) were by market forces interrelated and related to interstate commerce and to the regulated interstate market in wages. Moreover, each of those intrastate activities had the same character of effect on the statutory scheme of regulation–as each proscribed substandard wage tended, by market forces, to lower wages generally and to foster industrial discord, contrary to and tending to undermine the statutory scheme for maintaining wages of employees of enterprises engaged in interstate commerce (or the production of goods for or acquisition of goods directly in interstate commerce) and avoiding the disruption of interstate

56

commerce incident to industrial strife resulting from substandard wages.

In *Perez v. United States*, 91 S.Ct. 1357 (1971), the Court sustained Perez's conviction for making an extortionate extension of credit contrary to the provisions of Title II of the Consumer Credit Protection Act of 1968, rejecting the contention that the statute was unconstitutional as not requiring proof that the particular transaction affected interstate commerce. The Court observed that "[p]etitioner is one of the species commonly known as 'loan sharks' which Congress found are in large part under the control of 'organized crime,'" citing congressional findings under Title II that "[o]rganized crime is interstate and international in character," that "[a] substantial part of the income of organized crime is generated by extortionate credit transactions," and that "[e]xtortionate credit transactions are carried on to a considerable extent in interstate and foreign commerce and through the means and instrumentalities of such commerce" and "[e]ven where . . . purely intrastate in character . . . directly affect interstate and foreign commerce." *Id*. 1358 & n.1. It also noted evidence before Congress that loan sharking was "the second largest source of revenue for organized crime" and is "controlled by organized criminal syndicates," that "through loan sharking the organized underworld has obtained control of legitimate businesses, including securities brokerages and banks," *id*. at 1362, and concluded by stating that "loan sharking in its national setting is one way organized interstate crime . . . syphons funds from numerous localities to finance its national operations." *Id*. at

57

1362-63.

The Court likewise noted that "[t]here was ample evidence showing petitioner was a 'loan shark' who used the threat of violence as a method of collection," *id*. at 1358, and "[i]n the setting of the present case there is a tie-in between local loan sharks and interstate crime." *Id*. at 1367.[46]

In upholding the conviction the *Perez* Court relied on *Wickard*, *Wrightwood Dairy Co.*, *Heart of Atlanta*, *McClung*, and *Wirtz* for the principle that the class of activities is the proper measure of the required relationship to interstate commerce and that courts would not "'excise, as trivial, individual instances' of the class." *Perez* at 1360-61.

Plainly, *Perez* dealt with a national market in credit, in which individual instances interact with each other by virtue of market forces. More significantly, perhaps, it dealt with a statute attempting to regulate a particular interstate activity, that of "organized interstate crime," which was financed by the both local and interstate loan sharking which it controlled. *Id*.

---

[46]The Court also noted that Perez, among other collection threats, had said "my people" could put the victim in the hospital if he didn't pay. *Id*. at 1359. The Second Circuit, whose affirmance of the conviction was ultimately affirmed by the Supreme Court, noted that the victim borrowed the money to open his own butcher shop, having been unable to procure a loan through normal banking channels, that the rate of interest charged by Perez "was obviously large enough to perpetuate the indebtedness forever," that payments to Perez were made only by such methods as the victim's delaying payments to his meat suppliers, and that as a result of all this, including Perez's threats of violence and of "the attention of persons higher in the moneylending chain," the victim "abandoned his business" and fled to Puerto Rico "leaving his debts, legitimate and illegitimate, behind." *United States v. Perez*, 426 F.2d 1073, 1074 (2d Cir. 1970).

at 1362-63.[47]  Moreover, *Perez* also relied on the principle that "'when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so'" (quoting *Westfall v. United States*, 47 S.Ct. 629 (1927)), and then observed "in the present case there is a tie-in between local loan sharks and interstate crime." *Id*. at 1362.  This would appear to invoke the rule that where the same kind of trafficking is carried on both interstate and intrastate Congress in preventing the interstate trafficking may also proscribe the intrastate trafficking *where*, as a practical matter (for reasons such as the fungibility of the particular commodities or the like), it is necessary to regulate the intrastate trafficking in order to effectively regulate the interstate trafficking.  *See, e.g., United States v. Lopez*, 459 F.2d 949, 951-53 (5th Cir. 1972).[48]

---

[47]As the Second Circuit had observed in its affirmance of the conviction:
> "Loan-sharking activities can persuasively be characterized as generally in or affecting commerce precisely because such practices depend for their full effect on monopoly in metropolitan areas and national, or at least multi-state, organization.  This provided a logical basis for congressional focus on loan-sharking rather than on a variety of other crimes which may be far more "local" in nature, e.g., *robbery*, burglary, larceny."  *United States v. Perez*, 426 F.2d 1073, 1079 (2d Cir. 1970) (emphasis added).

[48]Much the same thought is expressed in the Second Circuit's opinion affirming Perez's conviction, viz:
> "What is known as legislative fact for a class of transactions–the effect on interstate commerce–is not necessarily easily provable in an individual instance of loan-sharking.  Trying to trace the flow of funds from the immediate enforcer to the organization behind the loan might well be impossible in a particular case. Money, of course, is a classic fungible commodity; showing its movement interstate may be completely impossible where all that moves is cash recorded, if at

59

The present case does not involve the targeting of any particular interstate market or activity, and it is evident that the proscription of robberies which do not have the requisite effect on interstate commerce is in no sense necessary to effective regulation of those that do.

We finally turn in this connection to *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 101 S.Ct. 2352 (1981) (*Hodel v. Virginia*) and *Hodel v. Indiana*, 101 S.Ct. 2376 (1981), in each of which the Court rejected Commerce Clause challenges by various coal producers to certain provisions of the Surface Mining and Reclamation Control Act of 1977. The challenged provisions constituted a complex regulatory scheme governing surface coal mining operations, requiring, among other things, land restoration, use of dams, spoil disposal and the like. The Court noted congressional findings that surface mining adversely affects interstate commerce by, *inter alia*, destroying the utility of land for commercial, industrial, agricultural, forestry and other purposes, causing erosion and contributing to flooding, polluting water and otherwise. *Hodel v. Virginia* at 2361. The Court observed that "coal is a commodity that moves in interstate

---

all, as an intangible on someone's records or in someone's memory." *United States v. Perez*, 426 F.2d 1073, 1080-81 (2d Cir. 1970).
Similarly, in *United States v. Darby*, 61 S.Ct. 451, 461 (1941), the Court stated:
"Congress in the exercise of its power to require inspection and grading of tobacco shipped in interstate commerce may compel such inspection and grading of all tobacco sold at local auction rooms from which a substantial part but not all of the tobacco sold is shipped in interstate commerce."

commerce.  Here Congress rationally determined that regulation of surface coal mining is necessary to protect interstate commerce from adverse effects that may result from that activity" and that "the power conferred by the Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one state."  *Id*. at 2363.  *Hodel v. Indiana* focused on the prime farmland provisions of the Act, holding that "Congress had a rational basis for finding that surface coal mining on prime farmland affects interstate commerce in agricultural products." *Id*. at 2384.  Both decisions note that federal standards were appropriate to insure that the forces of interstate competition in the coal industry would not undermine the maintenance of adequate standards.  Thus *Hodel v. Virginia* states:

> "the Act responds to a congressional finding that nationwide 'surface mining and reclamation standards are essential in order to insure that competition in interstate commerce among sellers of coal produced in different States will not be used to undermine the ability of the several States to improve and maintain adequate standards on coal mining operations within their borders.' . . . The prevention of this sort of destructive interstate competition is a traditional role for congressional action under the Commerce Clause." *Id*. at 2363.

*Hodel v. Indiana* expresses essentially the same thought.[49]  A footnote called for at the conclusion of the portion of the *Hodel v. Indiana* opinion dealing with the Commerce Clause states:

---

[49]The opinion there states: ". . . the Act reflects the congressional goal of protecting mine operators in States adhering to high performance and reclamation standards from disadvantageous competition with operators in States with less rigorous regulatory programs."  *Id.* at 2386.

61

"Appellees contend that a number of the specific provisions challenged in this case cannot be shown to be related to the congressional goal of preventing adverse effects on interstate commerce. This claim, even if correct, is beside the point. A *complex regulatory program* such as established by the Act can survive a Commerce Clause challenge without a showing that every single facet of the program is *independently and directly* related to a valid congressional goal. It is enough that the challenged provisions are an *integral* part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test." *Id*. at 2386 n.17 (emphasis added) (citing *Heart of Atlanta Motel* and *McClung*).

Thus the *Hodel* cases deal with a complex regulatory program of a particular industry engaged in interstate commerce designed to control a particular set of interstate effects of certain practices of that industry. The regulated instances of intrastate conduct are related to each other and to the particular scheme of regulation of interstate commerce and effects thereon by the forces of the interstate market in the particular regulated industry. And the regulated instances of intrastate conduct also all either have the same character of effect on interstate commerce or are an integral or essential part of the overall complex regulatory scheme governing particular businesses engaged in interstate commerce, such that unless the covered intrastate activities were regulated the regulatory scheme would be undercut.

It is also significant that in all the above discussed Supreme Court aggregation cases the intrastate conduct being regulated was conduct forming a part of the operation of a wholly or partially commercial enterprise (whether owned and operated by an individual or some legal entity). The regulations governed aspects of how such a commercial (or partially commercial) enterprise must

62

operate, what it must or must not do in its operations. See *Morrison*, 120 S.Ct. at 1750 n.4 ("[I]n every case where we have sustained federal regulation under *Wickard's* aggregation principle, the regulated activity was of an apparent commercial character.").

We recognize that language in *Russell v. United States*, 105 S.Ct. 2455 (1985), a prosecution under the federal arson statute, 18 U.S.C. § 844(i), suggests that a broader-indeed virtually unlimited-application of the aggregation principle is constitutionally permissible.[50] But the *only* issue in *Russell* was one of statutory construction; no constitutional or Commerce Clause claim was presented to the Supreme Court. *Russell* involved the owner of a two unit apartment building which was being rented to tenants at the time he attempted to destroy it by fire; he earned rental income from it and treated it as business property for tax purposes. *Id*. at 2456.[51] He unsuccessfully contended before the

_____

[50]*Russell* states:
"[T]he local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." *Id*. at 2457.

[51]See also the opinion of the Seventh Circuit affirming the conviction, *United States v. Russell*, 738 F.2d 825, 827 (1984), stating:
"The South Union Street apartment building was one of four pieces of property that Russell owned and rented to tenants. Russell's income tax returns from 1976 through 1982 demonstrated that Russell treated these properties as income property for which he claimed business deductions for depreciation and expenses. These properties also were covered by business fire insurance policies, in contrast to the defendant's own residence which he covered by a homeowner's policy limited to owner-occupied premises. At the time of the incident in question, Russell lived in neither unit of

63

Supreme Court, as he had in the District Court, 563 F. Supp. 1058 (N.D. Ill. 1983), and in the Court of Appeals, 738 F.2d 825 (7th Cir. 1984), "that the building was not commercial or business property, and therefore was not capable of being the subject of an offense under section 844(i)." *Id*. at 2456. In the Supreme Court he presented only an issue of statutory construction and expressly disclaimed any constitutional argument, his "Brief For Petitioner" there stating:

> "Mennuti [*United States v. Mennuti,* 639 F.2d 107, 2d Cir. 1981, the case on which he principally relied] does not hold, *nor does petitioner contend, that Congress could not have drafted a statute encompassing virtually every building* in the land, had it chosen to do so. *Thus, this case does not present a constitutional challenge to congressional power under the Commerce Clause.* It is our contention that, as held in Mennuti, the statute that Congress did pass, 18 U.S.C. § 844(i), as explicated by the House Judiciary Committee Report referred to above, does not cover a building used as a dwelling by a tenant of the owner, even though interstate utilities may have been used in the building." *Id*. at 11 (emphasis added; footnote omitted).[52]

We also note that section 844(i) applies only to property that is

the South Union Street property."

[52]The Government's "Brief For The United States" in the Supreme Court likewise states "Petitioner concedes that Congress has power under the Commerce Clause to prohibit arson of sort he attempted. Relying on *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), petitioner argues that Congress did not intend to exercise its commerce power fully in enacting section 844(i), but intended to cover 'business property' only." *Id*. at 5.
Nothing in either the District Court or the Court of Appeals opinions in *Russell* even mentions any constitutional issue, and each treats the case as solely one of statutory construction, namely whether § 844(i) was inapplicable (as the defendant contended, before those courts and the Supreme Court, that it was) because the property was residential and hence not business property. Both those courts rejected that contention, holding that though residential in one sense the property was used as a business by the defendant. *See United States v. Russell*, 738 F.2d at 827.

"active[ly] employ[ed] for commercial purposes," *Jones*, 120 S.Ct. at 1910, while the here relevant prong of the Hobbs Act is in no way analogously limited but rather applies regardless of whether or not the victim is engaged in any character of commercial activity. We conclude that *Russell* does not resolve the Commerce Clause aggregation issue as applied to this character of Hobbs Act prosecution.

We recognize that "substantial" for purposes of *Lopez* category three has a qualitative as well as a quantitative aspect, though those two aspects are somewhat interrelated rather than being entirely independent of each other. Limits on the aggregation principle, necessary to give meaning to "substantial" so as to preserve the distinction between "what is truly national and what is truly local," should thus take into account both quantitative and qualitative considerations. We conclude that the limits we have outlined do so notwithstanding that their most obvious focus may be quantitative. To the extent that there is a meaningful, rational basis to aggregate, then the aggregated quantitative effect on interstate commerce tends to qualitatively justify viewing the matter as truly national rather than truly local. Conversely, that the regulated category three intrastate conduct is not a commercial activity but is rather essentially "the suppression of violent crime" is a qualitative consideration pointing towards the regulation being of a truly local nature *unless* there is a meaningful and rational basis for aggregation. There is no sufficient rational basis to aggregate the effects on interstate commerce of any of the four individual prototypically

local crimes of violence here prosecuted with the effects on interstate commerce of all the undifferentiated mass of robberies covered by the Hobbs Act's general proscription of any and all robberies that "in any way or degree . . . affect[] commerce."

*Conclusion*

We turn to *Lopez and Morrison* for guidance, concluding that their relevance is not confined to cases where the statute lacks a jurisdictional element. Moreover, we conclude that the Hobbs Act's here relevant proscription of *any* robbery that "in any way or degree . . . affects commerce" does not constitute a regulation of commercial activity, notwithstanding that all robberies have *some* economic effect, and hence is within the scope of *Lopez* and *Morrison*. We further conclude that the instant robberies fall within *Lopez* category three, and for that reason they are within the Commerce Clause power only if they "substantially" affect interstate commerce. Individually considered, it is clear that none of them do. Nor is there any rational basis to for that purpose aggregate their respective effects on interstate commerce with the effect on interstate commerce of all the undifferentiated mass of robberies covered by the Hobbs Act's here relevant general proscription of any and all robberies which "in any way or degree . . . affect[] commerce." To allow such aggregation in *Lopez* category three cases would, without adequate justification, bring within the scope of the Commerce Clause the proscription of local violent (and other) crimes not constituting the regulation of commercial activity, crimes prototypical of those that historically have been within the reserved police power of the states, contrary

66

to the principle that the Commerce Clause is limited to matters that are truly national rather than truly local.

The conviction on each of the Hobbs Act counts accordingly should be reversed.[53]  Because each of the section 924(c)(1) counts of conviction is concededly dependent on the corresponding Hobbs Act count of conviction, all the section 942(c)(1) counts of conviction should likewise be reversed.

We respectfully dissent from the affirmance of these convictions.

---

[53]As we conclude the evidence does not suffice to show the requisite effect on interstate commerce we do not separately address the complaints of the jury charge.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in the dissent from the judgment affirming conviction, with whom GARWOOD, JOLLY and DeMOSS, Circuit Judges, join:

For a second time this court has been unable to agree upon the bite of recent Supreme Court interpretations of the Commerce Clause. This should be no surprise. We are left adrift by a statute whose reach is at best no more fixed than a property line set at the latest low tide mark of an ocean tributary.

There is some certainty. The Supreme Court has turned away from the New Deal view that the reach of the Commerce Clause is to be largely defined by the political process. But the path it will follow and how far it will go are undecided. In turn, the respective roles of Congress and the courts in this enterprise remain uncertain. Add the Hobbs Act's unique effort to define its reach by proscribing all robberies over which there is federal jurisdiction – a wholly tautological statement made at the zenith of the judiciary's abandonment of the commerce field to the Congress – and we are left with three choices. We can take the Hobbs Act as a congressional punt and decide it ourselves, we can leave it to the political process, or we can invoke the dialogic process of the doctrine of clear statement. The first two options describe this court's division. Our court's impasse leads me to state the case for the third path. At the least, it will make

68

plain the division of this court.  In describing this path, I need not retreat from the view expressed for half of our court in *Hickman* and so ably defended in Judge Garwood's opinion, again for one half of our court.

I

With the developing case law since *Hickman*, there is a step that principles of judicial restraint offer this inferior court before it decides if Congress has the authority under the Commerce Clause to make a federal crime of local robberies such as those before us here.  It could insist that Congress first do what it has not done – make clear its purpose to reach the wholly intrastate activity charged in the crimes now before us.  For reasons I will explain, by the third path we ought to refuse to apply the Hobbs Act to this genre of local robberies until Congress clearly states its purpose to do so. Only then should the courts decide the commerce question now being pressed upon us.

II

The Supreme Court has long required that if Congress intends to alter "the usual constitutional balance between the States and the Federal Government,"[54] it must make an unmistakably clear statement of its intention to do so in the language of the statute.[55]

---

[54] *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).

[55] *Will*, 491 U.S. at 65; *United States v. Bass*, 404 U.S. 336, 349 (1971).

Although it found expression most often in the context of congressional abrogation of state sovereign immunity,[56] the doctrine of clear statement has been applied broadly where uncertainty in the application of congressional directives would leave to the court the decision to upset the federal-state balance.  The Supreme Court has invoked the doctrine in various settings.  It found that states were not "persons" within the meaning of 42 U.S.C. § 1983,[57] and that the Federal Age Discrimination in Employment Act could not be construed to interfere with a State's choice of judges absent clear language that judges are included.[58]  Similarly, the doctrine of clear statement is one of the articulated limits on the spending power,[59] and federal laws criminally punishing "conduct readily denounced as criminal by the States" are narrowly interpreted absent a clear statement of Congress' intent to significantly alter the federal state-balance.[60]

The doctrine of clear statement is animated by principles of federalism inherent in the structure of the Constitution.[61]

---

[56] *Atascadero*, 473 U.S. at 242.

[57] *Will*, 491 U.S. at 65.

[58] *Gregory v. Ashcroft*, 501 U.S. 452, 463-64 (1991). This although the statute provided that uncertainty of scope should be resolved in favor of coverage. *Id*. at 467.

[59] *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

[60] *Bass*, 404 U.S. at 349.

[61] *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55-56 (1996) ("This rule arises from a recognition of the important role played by the Eleventh Amendment and the broader principles that it reflects."); *Gregory*, 501 U.S. at 461 ("This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our

Although the protection of the States against intrusive exercises of Congress' Commerce Clause powers is still largely left to the political process,[62] to permit courts to decide whether a poorly aimed congressional thrust encroached upon state regulation of intrastate criminal activity "would evade the very procedure for lawmaking on which *Garcia* relies to protect states' interests."[63] Insisting upon a clear statement from the Congress is a modest exercise of judicial power.  It only asks that Congress do its job, insisting that Congress engage its political responsibility by being clear of its purpose when it would reach into a sphere of state authority.[64]  In its most sanguine form, it "may lead some members to engage in the kind of deliberation about the scope of their Article I powers that they should undertake anyway as part of their responsibility to uphold the Constitution."[65]

The doctrine of clear statement does not require us to define "traditional governmental activities" in the abstract, an approach rejected by the Court in *Garcia*.[66]  We follow long-standing Supreme

---

constitutional scheme.").

[62] *Garcia v. San Antonio Metropolitan Transit Authority*, 469 US. 528 (1985) (declining to review limitations placed upon Congress' Commerce Clause powers by our federal system).

[63] *Gregory*, 501 U.S. at 465 (quoting LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25, at 480 (2d ed. 1988)).

[64] *See United States v. Lopez*, 514 U.S. 549, 577 (Kennedy, J., concurring) (citing *New York v. United States*, 505 U.S. 144, 155-169 (1992)).

[65] LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-9, at 857 (3d ed. 2000).

[66] *Garcia*, 469 U.S. at 538-540 (arguing that it is too difficult to define a "traditional governmental activity").

Court precedent, decided after *Garcia*,[67] that requires us to be certain of Congressional purpose before finding that a federal law overrides the federal-state balance.[68]  There is here no cordoning off of traditional governmental activities — rather, we follow the Supreme Court's lead, recognizing that the doctrine of clear statement protects a sphere of state authority.[69]  Local robberies of local businesses have always been the concern of state government and within this sphere of state authority that must not be entered absent a clear congressional statement.[70]  Significantly and independently it is a legal doctrine uniquely fitted to the hand of a court that would act with restraint in insisting that the enumerated powers remain just that.  For this reason, by this path we would not now decide that the Hobbs Act may be applied to discrete local robberies.  The political process ought to first decide its intended reach, at least before the full force of judicial review is unleashed.

III

---

[67] *Gregory*, 501 U.S. at 464 (explaining how the doctrine of clear statement works in conjunction with *Garcia*'s conviction that the federal-state balance is primarily protected by the political process); *Will*, 491 U.S. at 65; *Atascadero*, 473 U.S. at 247 (articulating doctrine of clear statement four months after *Garcia* was decided).

[68] *Id*. at 460 (citing *Atascadero*, 473 U.S. at 243).

[69] *Gregory*, 501 U.S. at 460-61 (requiring a clear statement of congressional intent before interpreting a law to infringe upon State sovereignty); *see also Lopez*, 514 U.S. at 611 (Souter, J., dissenting) (noting that the doctrine of clear statement should be relied upon in cases implicating congressional encroachment upon "state legislative prerogatives" or "enter[ing] into spheres already occupied by the States.").

[70] *Bass*, 404 U.S. at 523-24.

The Hobbs Act fails to provide the expression of "unequivocal congressional intent" necessary to intrude upon this sphere of state authority.[71]  It is true that the statute reaches all robberies that affect commerce "in any way or degree,"[72] and it is also a truism that the Hobbs Act expresses congressional intent to use "all the constitutional power Congress has."[73]  Neither of these statements state a congressional purpose to regulate the robberies here, as I will explain.  And although in recent years there have been episodic federal prosecutions of these type of local robberies, this activity of other branches of government reflects purpose only in the sense that it was not halted by the Congress – inaction from which we ordinarily do not infer purpose and certainly not clear purpose.  Significantly, there is no principled limit to a reading of commerce power that would sustain federal jurisdiction over the activity charged in the cases before us today.  Those who would argue that the Congress has clearly expressed its purpose to make federal crimes of the robberies here will have to persuade that Congress intended to reach the proverbial "robbery of the lemonade stand"; that its purpose was to claim federal hegemony over local activities, including a street mugging.  Either that or defy the words claimed to be so clear by some case-by-case judgment that is little more than the arbitrary, "well, not that far."

---

[71] *Atascadero*, 473 U.S. at 247.

[72] 18 U.S.C. § 1951.

[73] *Stirone v. United States*, 361 U.S. 212, 215 (1960).

By the time the Anti-Racketeering Act of 1934 was amended and became the Hobbs Act, the Supreme Court had already held that congressional power under the Commerce Clause was "plenary and extends to all such commerce be it great or small."[74]  This was a direct subscription to the view that the limits of congressional power under the Commerce Clause will be set by the political process; at the least the political process was the main player. As the Court later conceded in *Katzenbach v. McClung*,[75] it would not "interfere" as long as Congress violated "no express constitutional limitation."[76]  Until *Lopez* was decided, the Court upheld all Commerce Clause legislation as a matter of course, concluding that where there is "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end."[77]  Given that the Court wholly deferred to Congress' own interpretation of the limits of the commerce power, the observation that the Hobbs Act purports to reach to the limits of the commerce power as defined by the courts sheds no light.  In an era when the limits of the commerce power were defined by the Congress, even a congressional directive to reach to the limits of the Commerce Clause was no direction at all – it was wholly

---

[74] *Nat'l Labor Relations Bd. v. Fainblatt*, 306 U.S. 601, 606 (1939); *see also Nick v. United States*, 122 F.2d 660, 668-69 (4th Cir. 1941) (holding that *Fainblatt* mandates an expansive reading of the Anti-Racketeering Act).

[75] 379 U.S. 294 (1964).

[76] *Id*. at 304.

[77] *Maryland v. Wirtz*, 392 U.S. 183, 189 (1968) (quoting *Katzenbach*, 379 U.S. at 303-04).

tautological and as we will see, the Hobbs Act definition of commerce was not even that pointed.

*Lopez* and *Morrison,* with the doctrine of substantiality, returned the courts to the field, to once again police the limits of congressional authority under the Commerce Clause. Arguably, when the Court began to withdraw from the concession to the political process, the earlier congressional directives that the Act ought reach as far as the constitution permits could then be seen as a clear expression of congressional purpose in that it was no longer talking to itself; rather the courts were to decide. But with the doctrine of substantiality, whether the meandering intrusions by local United States Attorneys can be validated if Congress wishes to do so, is at best uncertain. The statute's description of robberies and its definition of commerce are quite different, its commerce definition clearly reaching conduct falling under the first two prongs of *Lopez* but leaving intrastate activity (as before us here) to be picked up at all only by its question-begging catch of all other commerce over which the United States has federal jurisdiction:

> "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; *and all other commerce over which the United States has jurisdiction.*"[78] (emphasis supplied)

The "robberies" in this case, if picked up at all, must be reached by the phrase "and all other commerce over which the United

---

[78] 18 U.S.C. § 1951(b)(3) (emphasis added).

States has jurisdiction." This expression of purpose, made at the zenith of legislative hegemony in the contest of who decides the limits of the commerce power, is no more plain than the Jones Act's reach of any seaman or the Omnibus Crime Control and Safe Streets Act's reach of every firearm.[79]

## IV

As we observed, it is now clear that this generalized reach cannot touch intrastate acts that do not have a substantial effect upon interstate commerce. The government concedes that the robberies before us cannot meet the substantial effects requirement – all robberies must be aggregated. At this point we can engage in a supposition that Congress thought all these local robberies were sufficiently linked to regulate them as a class. This is fanciful because such an aggregation was not even thought to be necessary at the time of the 1934 Act or the Hobbs Act. The fact is that Congress has never made that decision. It has never decided whether or what to aggregate.

*Hickman* insists that *Morrison*'s requirement that regulated intrastate activities have a substantial effect upon intrastate commerce has no content absent a further insistence upon a rational relationship among discrete effects that would be aggregated. This means that a judgment about the rationality of aggregating the effects of these discrete robberies is a correlative requirement of substantiality, and must be made. By this third path, it must

---

[79] *Welch*, 483 U.S. at 475-76 (applying doctrine of clear statement to exempt states from the Jones Act despite the sweeping language of "[a]ny seaman" in the statute); *Bass*, 404 U.S. at 350 (employing the doctrine of clear statement to exclude the "mere possession" of firearms from the reach of the Act).

first be made by the Congress. Only after that judgment is made, should the courts decide the issue of the level of deference due that legislative judgment. And it is then that the very content of the newly required substantial effect will be decided.

There is irony in a court about the task of policing the enumerated powers moving to the alternative of presuming a legislative judgment or supplying its own view in the first instance. If it is sufficient to hypothesize rationality, drawing upon the creativity of counsel and judicial imagination there is nothing substantial about substantiality; the courts will have wholly deferred to the political process as the arbiter of the state-federal role. On the other hand, if the congressional purpose is not relevant, or is simply supplied by the courts, the courts would be the exclusive arbiter. I am not persuaded that the principle of the separation of powers ought to only oscillate between these two polarities.

V

This is not the first time that the doctrine of clear statement has been applied to limit the application of a federal criminal statute to intrastate criminal conduct. In *United States v. Bass*,[80] for example, the Court required a clear statement from Congress before it would apply the Omnibus Crime Control and Safe Streets Act to extend federal law enforcement to a class of intrastate criminal activity that had long been regulated solely by

---

[80] *Bass*, 404 U.S. at 349–51.

the States.[81]   Two years later, in *United States v. Enmons*,[82] Congress applied this doctrine to the Hobbs Act.   In *Enmons* the Court refused to apply the Hobbs Act to violence associated with a labor dispute even though this activity was presumptively within the broad bounds of the statute.   Despite the general and broad language of the Hobbs Act, the Court required "language much more explicit" before it would apply it to local strikes because doing so would represent "an extraordinary change in federal labor law" and constitute "an unprecedented incursion into the criminal jurisdiction of the States."[83]

In response to *Enmons*, the Sixth and Ninth Circuits narrowly construed the Hobbs Act, concluding that only activities that constitute "racketeering" are prohibited by the Act.[84]   The Court rejected this approach in *United States v. Culbert*,[85] concluding that it conflicted with a plain reading of the statute as well as the legislative history.[86]   *Culbert* also rejected the claim that the doctrine of clear statement required the Court to read a racketeering requirement into the Hobbs Act, characterizing the argument as an attempt to "manufacture ambiguity where none

---

[81] *Id*. at 350-51.

[82] 410 U.S. 396 (1973).

[83] *Id*. at 350-51.

[84] *United States v. Culbert*, 548 F.2d 1355 (9th Cir. 1977); *United States v. Yokley*, 542 F.2d 300 (6th Cir. 1976).

[85] 435 U.S. 371 (1978).

[86] *Id*. at 373-378.

exists."[87] The Court also rejected the idea that a racketeering requirement must be read into the Act because without a racketeering requirement, the federal-state balance would be upset. The Court held that "there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law."[88] Of course, these were robberies fully under the first two prongs of *Lopez*, never seen as the exclusive domain of the states.

*Culbert* and *Enmons* teach that by defining as a federal crime conduct that it knew was punishable under state law, Congress knew that it would alter the balance of federal-state power. The question was whether the *application* of the statute would generate a result that interfered with state authority in a way that Congress had not intended.[89] Unlike *Culbert*, which involved an attempted robbery of $100,000 from a federally insured bank, *Enmons* involved the application of the Hobbs Act to violence used to achieve legitimate union objectives in a strike, thereby effectuating "an unprecedented incursion into the criminal jurisdiction of the States."[90] Here, as in *Enmons*, we cannot apply

---

[87] *Id*. at 379.

[88] *Id*. at 379.

[89] It should be noted that while *Culbert* held that "Congress intended to make criminal all conduct within the reach of the statutory language" of the Hobbs Act, this must be read as a response to the argument that a racketeering requirement be read into an act, given that the conduct reached in *Enmons* fit within the statutory language but presumably could not be reached without a clear statement from Congress.

[90] *Enmons*, 410 U.S. at 411.

the statute to violate the protected sphere of state authority without a clear statement that Congress intended that result.

V

To make clear its purpose to regulate this activity, Congress must make a legislative judgment about the rationality of regulating the activity as a class, impliedly or explicitly. Courts in turn must decide the deference due that legislative judgment, a task that has proved difficult and divisive in the course of recent cases. Only then will it be decided whether the requirement of substantial effect has content or is only a symbolic waive of the judicial hand. The recent pattern of Commerce Clause cases offers a powerful argument for the dialogic legislative first step afforded by the doctrine of clear statement.

The Court's claim of a judicial role in defining the limits of the commerce power did not suggest that it was to the exclusion of Congress. Nonetheless, we could simply proceed. And in justification point out that even with a clear statement, at the margins we might yet be engaged to adjudicate the limits by a case-by-case decision of this one's in and that one's out. But there remains the nagging precedent and transcendent question of the rationality of aggregating and what is meant by rationality, a task the Congress and the courts in turn have not faced. The question nags because of the further suggestion that unless no deference will be given to such a congressional decision, we ought not proceed without it, and the Supreme Court has not said that no deference is due.

80

All said, by the third path we ought to require Congress to first make clear the wholly intrastate robberies with an effect upon interstate commerce that it would regulate, whether connected by conspiracy, spree, or in some other way, possibly a confrontational response of single robbery without substantial effect.  As Chief Justice Rehnquist reminded in *Morrison*:

> [I]n the performance of assigned constitutional duties each branch of the government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others....[91]

We have nothing from the Congress.

---

[91] *United States v. Morrison*, n.7 120 S.Ct. 1740, 1753 (2000).

EDITH H. JONES, Circuit Judge, dissenting, with whom JOLLY, SMITH, DeMOSS and CLEMENT, Circuit Judges, join:

Judges Garwood's and Higginbotham's *non pareil* opinions explain why eight members of this court would hold that appellant McFarland could not be constitutionally prosecuted under the Hobbs Act for routine convenience store robberies. The Supreme Court's decisions in <u>Lopez</u> and <u>Morrison</u> compel this result, in our view, by limiting the extent to which the Commerce Clause facilitates ever-deeper federal incursions into the states' constitutional prerogative of local crime control. Eight other judges silently reject this conclusion. Unfortunately, they have withdrawn from the field of reasoned dispute, just as they did in a similar case two years ago. <u>United States v. Hickman</u>, 179 F.3d 230 (5th Cir. 1999) (en banc). It is our view that our court owes the public a candid explanation of our respective positions.

One may ask why our silent colleagues should be called on to write anything. Is it somehow inappropriate for courts to issue opinions when they are evenly divided? The short answer to this question is, no. Both the general role of the appellate courts and the exact circumstances of this case virtually demand expression of our competing views.

Federal appellate courts' twin duties are to decide appeals and to articulate the law. Writing reasoned opinions, especially in important cases, is critical to the responsible performance of these duties. One of the most prominent studies of the federal appellate courts exhorts us:

> The obligation to give reasons is vital to both functions. When reasons are announced and can be

weighed, the public can have assurance that the correcting process is working. <u>Announcing reasons can also provide public understanding</u> of how the numerous decisions of the system are integrated. In a busy court, the reasons are an essential demonstration that the court did in fact fix its mind on the case at hand. <u>An unreasoned decision has very little claim to acceptance</u> by the defeated party, and is difficult or impossible to accept as an act reflecting systematic application of legal principles. <u>Moreover, the necessity of stating reasons not infrequently changes the results by forcing the judges to come to grips with nettlesome facts or issues which their normal instincts would otherwise cause them to avoid.</u>

Paul D. Carrington, Daniel J. Meador and Maurice Rosenberg, <u>Justice on Appeal</u> 10 (West 1976) (emphasis added). Judge Wald, formerly Chief Judge of the District of Columbia Circuit, also emphasized this point: "The courts' opinions should contain reasoned explanations of their decisions to lend them legitimacy, permit public evaluation, and impose a discipline on judges." Hon. Patricia Wald, <u>The Problem with the Courts: Black-Robed Bureaucracy or Collegiality Under Challenge</u>?, 42 Md. L.Rᴇᴠ. 766, 768-69 (1983).

The benefits of issuing reasoned opinions – fostering public understanding of the law, accountability and transparency, and imposing self-discipline on the judges – are not limited to majority opinions. Judges' occasional writings, such as concurrences, dissents, opinions following denial of en banc rehearing – and opinions written despite an evenly divided court – lack the force of law but deploy the force of suasion for exactly the same purposes as majority opinions. In no case can we compel our brethren to provide published reasons for their decisions. By their silence here, however, they have defaulted their duties of public explication, accountability and transparency.

Our colleagues' uniform silence is initially disappointing because this is an important case. For more than a decade, the Supreme Court has been reinvigorating federalism as a component of our constitutional structure. Lower federal courts have the obligation conscientiously to enforce the Court's decisions in this evolving area. The new trend furnishes issues that should intellectually delight and challenge us and evoke our utmost analytical powers. Our opinions may be useful to the Supreme Court, for good or ill, when this case is appealed, and may be persuasive in other federal courts.

The reticence of our colleagues cannot, in our view, be rationalized as prudence, or the unwillingness to write reasons in a non-definitive case. The outcome of this case is definitive. When the court tackled the same issue two years ago, nearly the same group of judges declined to give reasons for affirming a Hobbs Act conviction against a Commerce Clause attack. As a result, the federal government feels free to prosecute purely local robberies without inhibition in this circuit. Our pattern jury instructions continue to say that a showing of <u>any</u> effect on interstate commerce (no matter how small) will suffice to create federal jurisdiction over a Hobbs Act crime. The only brake installed by this court against federalization of <u>all</u> robberies under the Hobbs Act consists of our arbitrary exclusion a few years ago of robberies of individuals. <u>United States v. Collins</u>, 40 F.3d 95 (5th Cir. 1994). The affirming judges' silence here thus assures, whether they desire it or not, that there is no principled limit on federal prosecution of robberies – even of the proverbial lemonade stand.

84

Adding to the mystery of their silence is the long-standing and consistent, albeit optional, practice of issuing explanatory opinions in other courts that have split evenly when sitting en banc.  There are at least two dozen cases in recent years, from nearly every circuit, in which such opinions were issued.[92]         Responding    to    a    colleague's

[92]<u>United States v. Brown</u>, 276 F.3d 14 (1st Cir. 2002) (en banc):  Three judges wrote separate statements supporting reversal of the district court's judgment

<u>Jean v. Collins</u>, 221 F.3d 656 (4th Cir. 2000) (en banc):  1 opinion concurring in affirmance by equally divided court; 2 dissenting opinions.

<u>United States v. Walton</u>, 207 F.3d 694 (4th Cir. 2000) (en banc):  An opinion for affirmance written by a deceased judge was concurred in by half the court.  In addition, two judges wrote separate concurring opinions, and three judges wrote dissenting opinions.

<u>United States v. Barber</u>, 119 F.3d 276 (4th Cir. 1997).

<u>Stupak-Thrall v. United States</u>, 89 F.3d 1269 (6th Cir. 1996) (en banc):  The order affirming the judgment of the district court by an equally divided vote states:  "The mandate will not issue for fourteen (14) days from the date of this order so that members of the court may file any separate opinions they wish to."  <u>Id</u>. at 1269.  Thereafter, concurring and dissenting opinions were filed.

<u>United States v. Page</u>, 167 F.3d 325 (6th Cir. 1999) (en banc):  8 judges joined separate concurring opinion supporting affirmance; 3 separate opinions supporting reversal.

<u>Norwood v. Bain</u>, 166 F.3d 243 (4th Cir. 1999) (en banc):  separate opinions written explaining reasons why judges would reverse or affirm district court's judgment on issues as to which en banc court was equally divided.

<u>United States v. Chen</u>, 131 F.3d 375 (4th Cir. 1997) (en banc):  defendants' 18 U.S.C. § 924(c)(1) convictions were affirmed by an equally divided court.  Judge Wilkins wrote a separate concurring opinion explaining the reasons for affirming those convictions.  The judges who voted to reverse the convictions did not file an opinion.

<u>Baker v. Pataki</u>, 85 F.3d 919 (2d Cir. 1996) (en banc):  One separate opinion in favor of affirming; two separate opinions in

favor of reversing.  The separate opinion in favor of affirmance cites cases regarding the practice of filing opinions in such cases in other circuits and notes:

> Our prior cases do not purport to announce a rule that opinions on the merits should not be written, and we believe that there should be an option to issue them (which is obviously exercised affirmatively in this case).  This is especially so because the views of this court of intermediate appeal might be useful to the Supreme Court in the event of an application for certiorari.

Id. at 922 n.2.

United States v. Hamrick, 43 F.3d 877 (4th Cir. 1995) (en banc).

Smith v. Zant, 887 F.2d 1407 (11th Cir. 1989) (en banc):  By an equally divided vote, the court affirmed the district court's grant of habeas relief as to Smith's death sentence.  Judge Tjoflat wrote a separate concurrence explaining why he and five other judges would affirm the denial of habeas relief as to the conviction, and would reverse the grant of habeas relief as to the death sentence.  Judge Kravitch wrote a concurrence and dissent explaining why six judges would reverse the denial of habeas relief as to the conviction and affirm the grant of habeas relief as to the death sentence.

United States v. Grey Bear, 863 F.2d 572 (8th Cir. 1988) (en banc):  Separate opinions were filed in support of reversal and in support of affirmance.  The opinion in support of reversal states that it is written "solely because" the opinion in support of affirmance "could cause confusion among lawyers and district judges of this circuit."  Id. at 573.  The opinion in support of affirmance states:  "As the divided court today affirms the rulings of the district court with respect to joinder and severance, it is appropriate that we articulate the reasons that five judges vote in favor of this result."  Id. at 580.

Hotel & Restaurant Employees Union, Local 25 v. Smith, 846 F.2d 1499 (D.C. Cir. 1988):  The court split over the issues of standing and ripeness.  Judge Mikva's separate opinion acknowledges that the opinions "carry no weight and determine no law of the circuit" and that it is "unlikely they will shed much light."  Nevertheless, he states that "[a] reasonable regard for our colleagues' views in disagreement ... compels our brief statement of how we believe this appeal should have been resolved."  Id. at 1500.  Judge Silberman filed a separate opinion for the other half of the court.

Piper v. Supreme Court of New Hampshire, 723 F.2d 110 (1st

86

criticism of his filing a separate opinion in one such case, Judge

Wilkins of the Fourth Circuit had this explanation:

> Judge Murnaghan's unsupported statement that a judge
> should remain silent when an en banc vote on a particular
> issue is equally divided is misplaced.  To the contrary,
> many times a judge feels that it is important for the

Cir. 1983) (en banc):  Separate opinions supporting affirmance
and reversal.

Elmore v. Cone Mills Corp., 23 F.3d 855 (4th Cir. 1994) (en
banc):  The court was evenly divided as to one issue.  Three
separate opinions were filed regarding that issue, two in support
of affirmance and one in support of reversal.

Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp. in
U.S.A., 945 F.2d 694 (4th Cir. 1991) (en banc):  Separate
opinions in support of affirmance and in support of reversal.

United States v. Klubock, 832 F.2d 664 (1st Cir. 1987) (en
banc):  one opinion supporting affirmance and two supporting
reversal.

Jenkins v. Agyei, 807 F.2d 657 (8th Cir. 1987) (en banc):
separate opinions supporting affirmance and reversal.

Roesch, Inc. v. Star Cooler Corp., 712 F.2d 1235 (8th Cir.
1983) (en banc):  After noting that the usual practice when a
judgment is affirmed by an equally divided court is not to
express any opinion, the judges supporting affirmance stated:
"In the present case, however, because of the significance of the
issue involved and the circumstances of the changed *en banc*
panel, we elect to set forth our reasons for affirming the
district court's judgment."  Id. at 1236.  A brief dissent was
filed by the judges supporting reversal, relying on the reasons
discussed in a dissenting opinion filed in a companion case
(Battle).

Battle v. Watson, 712 F.2d 1238 (8th Cir. 1983) (en banc):
The judges supporting affirmance adopted the reasoning of the
judges supporting affirmance in Roesch.  The judges supporting
reversal wrote a separate dissent.

But see FMC Corp. v. United States Dep't of Commerce, 29
F.3d 833 (3d Cir. 1994) (en banc):  One of the dissenting
opinions contains a footnote stating:  "Because the court is
equally divided on the issue of the government's liability as an
arranger, and it is our tradition not to write an opinion in that
situation, I do not set forth what I believe are independent
reasons to reverse the district court in that regard."  Id. at
854 n.7.

> litigants and others to know why the court is divided on a particular issue.  And, we routinely author opinions that do not carry the weight of the majority opinion such as concurring opinions, dissenting opinions, and opinions following a failed poll for en banc consideration; an expression of the reasons supporting a vote in this situation is not dissimilar.  Moreover, the expression of the views of individual judges when an en banc vote is equally divided is hardly novel.

United States v. Barber, 119 F.3d 276, 289 (4th Cir. 1997) (en banc) (citing cases).

In this court as well, silence is not our custom.  Judges have explained themselves in many previous cases where this court divided evenly en banc.  Carter v. United States, 325 F.2d 697 (5th Cir. 1963) (en banc); United States v. Holmes, 537 F.2d 227 (5th Cir. 1976) (en banc); Meltzer v. Bd. of Pub. Instruction of Orange County, Florida, 577 F.2d 311 (5th Cir. 1978) (en banc); United States v. Ibarra, 965 F.2d 1354 (5th Cir. 1992) (en banc); United States v. Greer, 968 F.2d 433 (5th Cir. 1992) (en banc); United States v. Kirk, 105 F.3d 997 (5th Cir. 1997) (en banc); United States v. Hickman, 179 F.3d 230 (5th Cir. 1999) (en banc).  In 1997, five of the eight judges who now say nothing joined an opinion on an issue similar to the one now before us, whether Lopez applied to invalidate a federal gun possession violation.  United States v. Kirk, 105 F.3d at 998 (en banc) (separate opinion of Judge Parker, joined by Judges King, Davis, Wiener and Stewart). The court was also evenly divided in Kirk.  One wonders what could prompt silence here, when juxtaposed with the writings there?  In sum, there  are customary, issue-specific and even judge-specific precedents for publishing written explanations following evenly split en banc decisions in our court.

88

Given the sharpness and timeliness of the issue that divides this court, the silence of those who affirm McFarland's conviction has a public dimension. The court is an institution defined by the <u>reasoned</u> exercise of power. It signals disregard for the public – the federal prosecutors and defense attorneys – who remain unenlightened over how to avert, or precipitate, serious discussion of the limits now imposed by the commerce clause on federalization of local crime. Silence exhibits a unique unconcern for appellant McFarland, as earlier for appellant Hickman, both of whom were entitled to know how the power of the federal government constitutionally bore down on them. Our court almost invariably gives reasons for affirming criminal convictions – but not today. Even in non-orally argued summary calendar dispositions, the defendants invariably receive <u>some</u> explanation in response to their appeals.[93] Finally, this silence signals indifference toward the predictability required of a fair-minded criminal justice system.

While diminishing the court's transparency and accountability, our colleagues' silence may also obscure their internal disagreements. But if that were the sole purpose, it makes no sense. Judges often express different reasons for reaching a single result. In fact, the best test of competing

---

[93]As Judge Richard Arnold put it, "The third duty of the court is to write an opinion which is intelligible, which explains the result, and which we hope, is acceptable to the losing side. I think about losing litigants a lot. Those are the people who need to understand that they have been heard – that a reasoning creature of some kind has evaluated their argument and comes to some sort of conclusion about it. They won't like it; they won't enjoy losing, but I hope that they will have a sense that they have been heard." Richard S. Arnold, <u>The Future of the Federal Courts</u>, 60 Mo. L. Rev. 533, 536 (1995).

legal theories is in the open marketplace of ideas.  Silence, therefore, could mean an unwillingness to compete.[94]

Had any of our silent colleagues chosen to compete, they would have to explain why – in the face of Lopez, Morrison, Jones and Judges Garwood's and Higginbotham's able opinions – the Hobbs Act regulates "interstate commerce" by federalizing even a single local robbery.[95]  Because our colleagues are unwilling to speak for themselves, and because the public is entitled to receive some reasons for affirming McFarland's conviction, we shall attempt to paraphrase the most significant arguments for their position.

Those who affirm concede that none of these local robberies, considered individually or collectively, "substantially affects" interstate commerce, as Lopez category III requires.  They acknowledge they can only show a proper basis for federal prosecution under Lopez and Morrison if the Hobbs Act "regulates" some intrastate activity whose aggregate national impact substantially affects interstate commerce.  But what is the regulated activity, and how are its "substantial effects"

_____

[94]"If I cannot give a reason I should be willing to stand to, I must shrink from the very result which otherwise seems good."  County of Los Angeles v. Kling, 474 U.S. 936, 940 n.6 (1985) (Stevens, J. dissenting from summary reversal) (quoting Karl Llewellyn, The Common Law Tradition 26 (1960), quoted in Reynolds & Richman, The Non-Precedential Precedent -- Limited Publication and No-Citation Rules in the United States Courts of Appeals, 78 Colum. L. Rev. 1167, 1204 (1978)).

[95]We all agree that under the Hobbs Act, Congress may punish robberies that are perpetrated against the channels of interstate commerce (Lopez category I), goods or things in interstate commerce (Lopez category II), and even individual robberies that "substantially affect" interstate commerce (Lopez category III). Our dispute rests solely on whether intrastate robberies like the ones before us, that have no impact on interstate commerce, can be federally prosecuted.

calculated?  There are mutually conflicting ways to answer these critical questions.  The silent judges apparently cannot agree on the answers, and some of them apparently adhere to more than one answer.

The first route is to assert that robbery is an "economic activity."  This theory draws on an alleged distinction between Morrison and Lopez.  Even if Morrison states a categorical rule against aggregating the effects of "noneconomic, violent criminal conduct", some of the silent judges apparently believe that aggregation of robberies under the Hobbs Act is still permissible.  While Lopez suggested that aggregation of noncommercial activities is inappropriate, see Lopez, 514 U.S. at 561, 115 S. Ct. at 1631 (emphasis added), Morrison's language "clarifies" that the aggregation of noneconomic activities is problematic.  529 U.S. at 617, 120 S. Ct. at 1754 (emphasis added).  Thus, their argument goes, Congress could have had a rational basis for concluding that the Hobbs Act regulates economic activity because robbery is an "economic crime."  More colorfully, one might assert that because the thief sticks his hand into the stream of commerce, not inadvertently or tangentially, but as a primary and defining aspect of his conduct, robbery is an economic activity.  Substituting yet another metaphor, the robber's conduct is a "coercive barter" in an unquestionably commercial environment – a convenience store.

Of course, robbery should not be considered an "economic" activity.  The dictionary defines "economic" as "relating to, or concerned with the production, distribution and consumption of commodities."  Webster's Third New International Dictionary 720

(1981). Certainly, robbery has some economic effect, but so do murder, aggravated assault, and theft. Further, to say that robberies may be aggregated because robbery is an economic activity is contrary to the decisions of this court and many other courts that robberies of individuals may not be aggregated for prosecution under the Hobbs Act. See cases cited in n.35 of Judge Garwood's opinion. Under the robbery-as-economic-activity theory, Congress could make it a federal crime intentionally to walk out of your neighbor's house with a $5 bill he left on his kitchen counter.

Arson is frequently an economically-motivated crime, but in Jones, the Supreme Court interpreted the federal arson statute not to reach the immolation of an individual owner-occupied residence. Justice Ginsburg wrote for a unanimous Court that, "[g]iven the concerns brought to the fore in Lopez, it is appropriate to avoid the constitutional question that would arise were we to read [the federal arson statute] to render 'the traditionally local criminal conduct' in which petitioner Jones engaged 'a matter for federal law enforcement'" Jones v. United States, 529 U.S. 848, 858, 120 S. Ct. 1912 (2000).[96]

Moving in exactly the opposite direction, some of our silent colleagues would agree that robbery is not an economic act,

---

[96]Justice Ginsburg further noted that in Lopez, "the Court stressed that the [regulated activity] was one of traditional state concern and that the legislation aimed at activity in which 'neither the actors nor their conduct has a commercial character." Jones, 529 U.S. at 858, 120 S. Ct. at 1911-12 (quoting Lopez, 514 U.S. at 577, 580, 115 S. Ct. at 1638, 1640 (Kennedy, J. concurring)). Additionally, Justice Stevens, in concurrence, stated the courts should be reluctant to "believe Congress intended to authorize federal intervention in local law enforcement in a marginal case such as this [arson of a private residence]." Id. at 859 (Stevens, J. concurring); see also Lopez, 514 U.S. at 561 n.3, 115 S. Ct. at 1631 n.3.

but because the Hobbs Act has a jurisdictional hook encompassing any robbery that has "any effect" on interstate commerce, and because robbery is not "too attenuated" from commercial enterprise, Congress has power to proscribe all robberies under the Commerce Clause. But the question these judges have not answered is how their rationale provides any limit at all to the prosecution of local crime by the federal government. Under their position, a federal statute could extend to all murders and assaults which "in any way or degree affect commerce," or a federal statute could criminalize all murders or assaults in which the victim is an income earner and which "in any way or degree affect commerce." Aggregating such crimes would result in the requisite "substantial effect." Obviously, such "reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit or consumption." Morrison, 529 U.S. at 615, 120 S. Ct. at 1752-53. Morrison clearly rejected this view.

Some would affirm by crafting a narrower approach to the statute, arguing that the Hobbs Act is really concerned with convenience store robberies and the like, that is, with robberies of commercial establishments.[97] This approach stalls, however, because it requires ignoring or judicially rewriting the statute;

---

[97]Advocates of this position would contend that Congress can, pursuant to its Commerce Clause power, regulate otherwise local criminal conduct that targets businesses, but not individuals. This "rule", they could say, provides a clear, practical guideline for legislators who are considering federal criminal legislation as well as for federal prosecutors. Let us ignore that this "rule" amounts to judicial legislation – if the "rule" were so easily defensible, why is it not articulated as the position of the silent colleagues?

the statute is not restricted to robberies of businesses or commercial enterprises, much less to convenience stores or any other specific victim. It plainly and broadly applies to any robbery of any victim which "in any way or degree . . . affects [interstate] commerce." Further, in a purely result-oriented fashion, this position allows aggregation of all convenience store robberies, so that any of them – including a $1 robbery from a local store that buys $10 a month of out-of-state goods from a local wholesaler - may properly be prosecuted as a federal crime, but it excludes a $10,000 robbery of diamonds from a jewel merchant walking along a city street. Congress was hardly so inconsistent.

Alternatively, instead of facing the hard decision whether robbery is or is not an "economic activity," some of our silent colleagues would argue that the Hobbs Act is "more closely related to economic activity" than are other crimes, hence, aggregation of robberies is permitted. But, as the Court pointed out in Morrison, "in those cases where we have sustained regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." Morrison, 529 U.S. at 611, 120 S. Ct. at 1750. See also Morrison, Id. n.4 (". . . in every case where we have sustained federal regulation under the aggregation principle in Wickard (citation omitted), the regulated activity was of an apparently commercial character. See, e.g., Lopez.") (citation omitted) (emphasis added). All of the Court's prior aggregation holdings involved a regulation of the conduct of a wholly or partially commercial enterprise. The Hobbs Act is not

94

such a statute.  This theory would <u>extend</u> aggregation to an area no Supreme Court holding has traversed.   <u>Lopez</u> and <u>Morrison</u> plainly point away from such an extension.

Then again, some of our colleagues may head in a different direction and dispute the premise that it has made a crucial difference to the Supreme Court whether aggregation was based on the status of the regulated activity as commercial or noncommercial.  From this standpoint, aggregation turns on the effects of the activity (such as robbery) and not on the inherent relation of the activity to interstate commerce.  But <u>Lopez</u> says exactly the opposite:  "[w]here economic activity substantially affects interstate commerce, legislation regulating <u>that activity</u> will be sustained."  <u>Lopez</u>, 514 U.S. at 560, 115 S. Ct. at 1630 (emphasis added).

One distinctive approach would state that robbery is not an economic activity, but also would assert that Judge Garwood's opinion has constructed a new test different from that in <u>Lopez</u> and <u>Morrison</u>.  Since no further explanation is offered, the source of the novelty would apparently be left to the reader's imagination.

Yet another conclusory position seems to assert that prosecutors have been convicting defendants under the Hobbs Act by aggregating the *de minimis* effects of local, intrastate robberies for forty years.  Of course, <u>Lopez</u> and <u>Morrison</u> had not been decided forty years ago.  Moreover, even though recent opinions of sister circuits may support this sort of an argument for *stare*

95

*decisis*, their inadequate reasoning does not sustain the constitutionality of the Hobbs Act as here applied.[98]

Finally, some of our silent colleagues would go so far as to suggest that if the Supreme Court wanted to rein in application of the Hobbs Act, it has had ample opportunity to do so. This court should not take the initiative. But this reasoning is backwards. It is the lower courts' duty faithfully to apply the Supreme Court's rulings in <u>Lopez</u> and <u>Morrison</u> in the first instance. We cannot ignore the Court's decisions any more than we are permitted to second-guess its failure to grant certiorari on issues of interest to us.

Despite their internal conflicts or incoherency, all of these arguments share a common thread. None of them responds to the federalism concerns expressed so unmistakably in <u>Lopez</u> and <u>Morrison</u>.[99] None of them sets any principled limit on the exercise of federal power to prosecute indisputably local crime.[100] None of

[98]<u>See</u> <u>United States v. Gray</u>, 260 F.3d 1267, 1274-75 (11th Cir. 2001); <u>United States v. Peterson</u>, 236 F.3d 848, 852 (7th Cir. 2001); <u>United States v. Malone</u>, 222 F.3d 1286, 1294-95 (10th Cir. 2001). Several of the circuit courts have also drawn the patently arbitrary distinction between robberies of individuals and commercial establishments.

[99]To cite but one example: "Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." <u>Morrison</u>, 529 U.S. at 611, 120 S. Ct at 1750, (<u>quoting</u> <u>Lopez</u>, 514 U.S. at 577, 115 S. Ct. at 1638 (Kennedy, J., concurring)).

[100]"If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any type of violence since gender-motivated violence,

them respects that the words "commerce" and "economic" have fixed meanings, which do not conventionally include ordinary robbery.

Chief Justice Rehnquist's conclusion in <u>Morrison</u> was, however, tolerably clear to the lay reader:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact we preserve one of the few principles that has been consistent since the [Commerce] Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."

<u>Morrison</u>, 529 U.S. at 617, 120 S. Ct. at 1754. (citations and footnote omitted). We might have had a forthright and responsible debate, if our colleagues had adhered to their duty to express reasons why they have chosen to allow McFarland to be convicted of a federal crime.

---

as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part." <u>Morrison</u>, 529 U.S. at 615, 120 S. Ct. at 1752-53.